**SAHA THAI STEEL PIPE CO., LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Wheatland Tube Corporation, Thypin Steel Company, Inc., Defendants–Intervenors.**

No. 91–11–00813.

United States Court of International Trade.

July 15, 1993.

---

Dickstein, Shapiro & Morin, Arthur J. La-fave, III, Jeffrey W. Brennan, Douglas N. Jacobson, Washington, DC, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, U.S. Dept. of Justice, Civ. Div., Commercial Litigation Branch, Vanessa P. Sciarra, Wendell L. Willkie, Gen. Counsel, U.S. Dept. of Commerce (Jeffrey B. Denning, U.S. Dept. of Commerce, Office of Chief Counsel for Import Admin., Washington, DC, of counsel), for defendant.

Schagrin Associates, Mark C. Del Bianco, Washington, DC, for defendant-intervenor Wheatland Tube Corporation.

Sharretts, Paley, Carter & Blauvelt, P.C., Michael H. Greenberg, New York City, for defendant-intervenor Thypin Steel, Inc.

## MEMORANDUM OPINION

MUSGRAVE, Judge.

Plaintiff Saha Thai Steel Pipe Co., Ltd. ("Saha") challenges two aspects of the final determination by the International Trade Administration, United States Department of Commerce (the "ITA" or the "Department" or "Commerce"), in the 1988 countervailing duty administrative review ("1988 Review") involving carbon steel pipes and tubes from Thailand. *See Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand, Final Results of Countervailing Duty Administrative Review* 56 Fed.Reg. 50,852 (Oct. 9, 1991).

Saha responded fully to a United States subsidy investigation for which Saha itself had petitioned. Saha now challenges the "best information available" ("BIA") rate applied to the non-responding exporters because Saha contends that standard Commerce practice required the application of a higher, indeed the highest, rate to those exporters. Saha also contends that Commerce violated its statutory duty by not even considering the case in which the higher rate had been published. As a result, Saha contends that the nation-wide weighted average was lowered, because Commerce improperly selected a lower BIA rate, to such an extent that Saha was precluded from benefitting from a company-specific rate that was substantially lower still.

Defendant argues that the issue of the BIA rate selection is not properly before this Court because Saha knew that Commerce used the lower rate as BIA and did not protest.[1] Moreover, defendant argues that Commerce's use of the lower rate for the non-responding exporters reflecting a Thai Investment Promotion Act ("IPA") section 28 subsidy was a reasonable exercise of its administrative discretion and was in accordance with law. Commerce maintains that it may not use for BIA a rate that included benefits from another program not under consideration in the 1988 review. The rate urged by Plaintiff was the result of a combined calculation based on IPA section 28 *and* section 36 subsidies.

### Background

The facts and procedural history in this case are particularly important, in Saha's view, because they point to the inequity, if not the illegality, of Commerce's position. On September 20, 1989, Commerce initiated a review, upon Saha's request, of the countervailing duty order covering all exports of certain circular welded carbon steel pipes and tubes from Thailand during the calendar year 1988. Petitioner evidently sought a downward adjustment of duties in place since 1985, and alleges full cooperation, in conjunction with the Royal Thai Government ("RTG"), with the inquiry. *Plaintiff's Memorandum* at 4. Five other producers responsible for substantial exports declined to respond to the Commerce questionnaire. *Id.*

---

1. Defendant-intervenor Wheatland Tube Corpo-ration did not submit briefs in this action.

On June 26, 1991, Commerce published the preliminary results of the 1988 review. 56 Fed.Reg. 29,222. Based on Saha's response, Commerce determined that Saha received a total "bounty or grant" of .90 percent *ad valorem.* Based on BIA, in accordance with 19 U.S.C. 1677e(c), Commerce found that the non-responding exporters received benefits from tax and duty exemptions under section 28 of the IPA and other programs. Consequently, Commerce published a separate 7.18 percent duty for all other producers and exporters. *Id.;* 56 Fed.Reg. 29,222; *A.R. 17.* Saha did not object to these preliminary results because it agreed with Commerce's calculations and the company-specific rate assessed to it. According to Saha, several U.S. importers and exporters argued during a brief hearing that the benefit rate assessed these other exporters had been overstated. No party challenged Commerce's decision to establish the separate rate for Saha. *Plaintiff's Memorandum* at 6.

In the final administrative review determination, Commerce's finding regarding the grant to Saha did not change (.90 percent). Because the other exporters did not provide information regarding section 28 grants, Commerce "used ..., as BIA, the highest published non-BIA rate found for the IPA program in a final determination in an investigation or the final results of an administrative review for any product." 56 Fed.Reg. 50,853–54. Commerce considered four different subsidy programs individually in its rate calculation for the non-responding producers; section 28 and section 36 were but two of those four programs. Assertedly applying this test for the section 28 portion of its calculation, Commerce selected, as the highest "published non-BIA rate," the rate published in *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Carbon Steel Butt–Weld Pipe Fittings From Thailand,* 55 Fed.Reg. 1,695 (Jan. 18, 1990) *("Butt–Weld Pipe Fittings")* which was 1.89 percent *ad valorem.* 56 Fed. Reg. 50,584.

Subsequent to publication of the preliminary results, interested parties had thirty days to submit to Commerce their case briefs containing comments upon the preliminary results and seven days thereafter to submit rebuttal briefs. *See* 19 C.F.R. § 355.38(c). Saha Thai did not submit a case brief. Although Saha Thai did submit a rebuttal brief, it did not therein object to Commerce's decision to use the 1.89 percent *ad valorem* rate from *Butt-weld pipe* as BIA for IPA section 28.

In response to the comments submitted by several interested parties, Commerce changed the basis upon which it calculated the BIA rates applied to the non-responding companies in its final review determination with respect to two of the *other* programs (*i.e.,* other than IPA section 28), reducing the total net "bounty or grant" found for the non-responsive companies to less than 5.0 percent. 56 Fed.Reg. 50,854. As a result, the weighted-average net bounty or grant for all companies (including Saha) fell from 7.18 percent to 2.86 percent *ad valorem.* Commerce has the discretion not to publish a separate company rate when a certain company's rate was not "significantly different" from other exporters' rates for purposes of 19 C.F.R. § 355.22(d)(2). "[S]ignificantly different," for purposes of 19 C.F.R. § 355.-22(d)(2), is defined as more than 5.0 percent. Since Saha's assessed rate of *.90* percent *ad valorem* was within five percentage points of the revised group assessed rate of 2.86 percent *ad valorem,* Commerce exercised its discretion not to enter a company-specific rate of .90 percent to Saha. Rather, Commerce assessed a uniform country-wide rate of 2.86 percent *ad valorem* on all producers subject to the investigation, including Saha.

*Discussion*

1. Exhaustion of Administrative Remedies

■ As a threshold issue, Commerce argues that because Saha did not raise any objections to the selection of *Butt-weld Pipe Fittings* for the section 28 rate after the preliminary determination, even though it had that opportunity to do so in its rebuttal brief, Saha may not now address such complaints to this Court. *Defendant's Memorandum* at 6. Plaintiff, on the other hand, argues that the issue raised on this appeal— whether Commerce erred in selecting the

IPA section 28 rate in *Butt-weld Pipe Fittings* as BIA for the non-cooperating exporters and should instead have used the higher rate published in *Ball Bearings*[2]—is a question of law and therefore places no great burden on the Court or the parties.[3] Moreover, plaintiff asserts that it had no cause to object until Commerce reversed itself in its final determination. Saha was satisfied with the .90 percent rate assessed to it at the preliminary determination.

Both parties have agreed that the doctrine of exhaustion of administrative remedies is discretionary. The Court, after duly considering defendant's well-reasoned arguments, finds that to preclude plaintiff from raising the issue of whether the section 28 rate was properly selected would constitute an overly harsh penalty on Saha Thai. The Court is mindful that Saha Thai initiated this review and cooperated fully in the investigation with the intent of having its countervailing duty assessment lowered to reflect the actual benefit of its subsidies. In addition, Saha Thai received all the remedy it sought from the preliminary determination, *i.e.*, it received a very low company-specific duty assessment at .90 percent.

Defendant urges an application of the exhaustion doctrine that would motivate all interested parties to an administrative review to brief and litigate every possible issue, even when the relief sought appears to have been secured at the preliminary determination. This policy would result in much more wasteful litigation than will be caused by a hearing of the section 28 rate selection issue here. Had the Department not chosen to do an about-face and penalize Saha Thai with a country-wide rate in the final determination, this entire case, much less the issue of the BIA rate from section 28, would not be before the Court. Thus, the Court finds that fairness and judicial economy weigh in favor of permitting plaintiff to raise the issue of the proper section 28 rate at this time before

the Court. In contrast, neither defendant nor defendant-intervenor are seriously prejudiced by this decision.[4] Therefore, the Court proceeds to an analysis of plaintiff's argument regarding whether defendant abused its discretion in choosing the BIA rate from *Butt-weld Pipe Fittings* for section 28.

2. Best Information Available

■ Plaintiff concedes that Commerce was justified, under 19 U.S.C. § 1677e(c), in using BIA. *See Plaintiff's Memorandum* at 8. However, Plaintiff claims that Commerce neglected to select the "highest published non-BIA rate" for section 28 of the IPA program and cites a previous 19.38 percent section 28 rate determination. *Ball Bearings*, 54 Fed. Reg. 19,130, 19,134. Had the 19.38 percent *ad valorem* rate been applied, Saha would have received a separate company-specific rate previously determined at .90 percent because the difference in the weighted country average would have exceeded the maximum 5 percent for assessing a uniform duty. *Plaintiff's Memorandum* at 9.

The rate published in *Ball Bearings* represented benefits received by the respondents under two related sections of the IPA, section 28 and section 36(1). IPA section 28 provides tax and duty exemptions on imported equipment and parts; IPA section 36(1) provides tax and duty exemptions on imported consumable goods not physically incorporated in the finished, exported product. *Plaintiff's Memorandum* at 9, *citing Ball Bearings* at 19,134. Commerce did not investigate IPA section 36(1) in the instant administrative review.

According to plaintiff, Commerce's decision in *Ball Bearings* to publish a combined rate for IPA sections 28 and 36(1) was purely one of discretion. Plaintiff asserts that publication of separate rates for each benefit would have been consistent with law and prior prac-

---

**2.** *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order: Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations: Antifriction Bearings (other than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand,* 54 Fed.Reg. 19,130, 19,134 (May 3, 1989) ("Ball Bearings").

**3.** *See e.g., Hercules, Inc. v. United States,* 11 CIT 710, 735, 673 F.Supp. 454, 476 (1987); *Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 136, 583 F.Supp. 607, 611 (1984).

**4.** *See Rhone Poulenc,* 7 CIT at 136, 583 F.Supp. at 611.

tice. *Plaintiff's Memorandum* at 9. In essence, plaintiff contends that Commerce was obligated to use the 19.38 percent rate found in *Ball Bearings* for BIA in this case, even though that rate was the result of an investigation into section 36 grants in addition to section 28 grants. In the alternative, plaintiff urges that at the very least, Commerce abrogated its duty to apply its own BIA test consistently by *not* referring to the *Ball Bearings* decision to determine what the specific section 28 component of the combined rate was.

Section 776(b) of the Tariff Act of 1930, as amended, ("the Act"), 19 U.S.C. § 1677e(c), mandates that, in making its determinations, Commerce shall "use the best information otherwise available" "whenever a party or any other person refuses or is unable to produce information requested." In the instant case, five exporters of the subject merchandise did not provide any information in response to Commerce's countervailing duty questionnaire and, specifically, did not provide any information indicating that they did not benefit from IPA section 28. Commerce therefore properly resorted to BIA.

Plaintiff contends that as a matter of law, defendant was required to pick the highest known rate previously established in a review for the section 28 program as BIA. Plaintiff cites *dicta* from the Court of Appeals for the Federal Circuit ("CAFC") for the proposition that the best information rule may be viewed "as an investigative tool, which th[e] agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest." *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 134, 744 F.2d 1556, 1560 (Fed.Cir.1984).

Plaintiff also contends that Commerce has a well-established policy in countervailing duty proceedings to use, as BIA the "highest published non-BIA rate" for a given program

in any determination involving the same country. *Plaintiff's Brief at 11.*[5] In fact, plaintiff notes that Commerce established the very same test in the case at bar, stating that it "used, as BIA, the highest published non-BIA rate found for the IPA program in a final determination in an investigation or the final results of an administrative review for any product." 56 Fed.Reg. 50,852, 50,854 (Oct. 9, 1991).[6]

The CAFC later clarified its interpretation of how Commerce was permitted to apply BIA though it avoided the "difficult question of whether the agency may use the best information rule to 'penalize' a party which submits deficient questionnaire responses:"

> That is not what the agency did in this case. In order for the agency's application of the best information rule to be properly characterized as 'punitive,' the agency would have had to reject low margin information in favor of high margin information that was demonstratively less probative of current conditions. Here, the agency only *presumed* that the highest prior margin was the best information of current margins. Since Rhone Poulenc offered no evidence showing that recent margins were more probative of current conditions than the highest prior margin, the agency found the highest prior margin to be the best information otherwise available.

*Rhone Poulenc, Inc. v. United States* 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1190 (Fed.Cir. 1990). In other words, in the case of the non-responding party, an assumption is made that if that party possessed probative information justifying a lower rate than the highest previously published rate, it would have offered that information to Commerce as a matter of its economic interest. When the party does not respond, it is reasonable to presume that accurate information regarding that aspect of the duty calculation would

---

**5.** Plaintiff cites for example, *Final Affirmative Countervailing Duty Determination; Industrial Belts and Components Thereof, Whether Cured or Uncured, from Israel,* 54 Fed.Reg. 15,509, 15,511 (Apr. 2, 1988); *Final Affirmative Countervailing Duty Determination: Industrial Phosphoric Acid from Israel,* 52 Fed.Reg. 25,447, 25,448–50 (July 7, 1987); *Preliminary Affirmative Countervailing Duty Determination: Certain Iron–Metal Con-*

*struction Castings from Mexico,* 47 Fed.Reg. 56, 377, 56,378–79 (Dec. 16, 1982).

**6.** Plaintiff further notes that in the final review results, Commerce cited two determinations in which it had relied on this type of information as BIA. *Plaintiff's Brief at 11.*

have led to an assessment of equal or greater magnitude than the highest prior margin. Indeed, none would suggest that a party be rewarded for non-compliance. The Court in *Rhone Poulenc,* held that this presumption was reasonable and *not* punitive.

Moreover, the ITA's implementing regulations permit the Department flexibility in determining what is "best information" depending on the reasons for the non-compliance. *See id.* at 67, 899 F.2d at 1191, *citing* 19 C.F.R. § 353.51 (1988) ("where a party ... refused to provide requested information, that fact may be taken into account in determining what is the best available information"); *see* 19 C.F.R. § 353.37(a) (1992). As *Rhone Poulenc* teaches, the best information rule and the Department's flexibility to apply the non-compliance presumption serve the dual interests of encouraging compliance, and determining current margins as accurately as possible—a fundamental goal of the statute. *Rhone Poulenc,* 8 Fed.Cir. (T) at 68, 899 F.2d at 1191.

Recently, beginning with the administrative review of antidumping duty orders covering antifriction bearings, Commerce formalized its flexible administration of BIA in a two-tier approach hinging on the level of cooperation of the party that has not submitted sufficient information.[7] Following that approach, the more cooperative party can expect the agency to pick a more favorable rate as "best information." *See id.* 996 F.2d at 1188–1189. The CAFC in *Allied–Signal Aerospace,* after finding little guidance in the legislative history, found that Congress "explicitly left a gap" in the statute as to exactly what should constitute "best information." *Allied–Signal Aerospace Co.,* at 1191, *citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Accordingly, the ITA's construction of the statute in determining how and what it selected as BIA was conferred considerable deference. *See id.,* at 1191. The CAFC upheld the Department's two-tier approach, even though it rejected Commerce's selection of harsher tier because it found that in fact

the party in question had cooperated. *See Allied–Signal Aerospace Co.,* at 1192–1193.

In the case at bar, however, Saha Thai would have the Court do the opposite: constrain the Department to the harsher rate as BIA because the parties *did not* cooperate. The Court is not prepared to force that conclusion based on the facts of this case. First, the *Allied–Signal Aerospace* court stressed the broad discretion Commerce has in implementing the best information rule. Second, and perhaps more importantly, the court focused on the laudatory statutory purpose underlying the BIA rule provided in 19 U.S.C. § 1677e, which is to facilitate the determination of dumping margins as accurately as possible within the confines of extremely short statutory deadlines. *See id.* at 1191.

Toward this purpose, the agency presumption is rebuttable. *Rhone Poulenc,* 8 Fed. Cir. (T) at 68, 899 F.2d at 1191. Therefore, if the Department is presented with credible evidence between the preliminary determination and the final determination of a more accurate rate, the Department must be permitted the flexibility to chose the lower rate, even if the result is that the non-cooperating parties experience some gain from that change. To summarize, the issue in this case is not, as plaintiff urges, whether Commerce must woodenly apply the highest rate ever previously established as BIA for non-cooperating parties. Rather, the issue is whether Commerce acted reasonably in selecting the lower rate from *Butt-weld Pipe Fittings* as BIA for section 28 of the IPA after considering the parties' comments on the preliminary determination. Put another way, the Court must determine whether Commerce acted reasonably in discarding *Ball–Bearings* because the benefits from sections 28 and 36 of the IPA were not segregated in the final 19.38 percent duty determination. The Court must also decide whether Commerce had a duty to investigate the *Ball Bearings* case to determine the differential between the section 28 and section 36 components of the 19.38 percent duty.

This Court has held that the choice of BIA need not be the "best" information the agen-

---

7. *See Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185 (Fed.Cir.1993) ("Allied–Signal Aerospace") for a detailed exposition and approval of Commerce's two-tier approach.

cy could have possibly acquired. *See N.A.R., S.p.A. v. United States,* 14 CIT 409, 416, 741 F.Supp. 936, 942 (1990), *citing Chinsung Indus. Co. v. United States,* 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989). "Otherwise, the administrative process would be frustrated and the burden of creating an adequate record would shift from respondents to the ITA [citation omitted]. The Court must uphold ITA's use of best information available if the use of that data is supported by substantial evidence in the record and otherwise in accordance with law." *N.A.R., S.p.A.,* 14 CIT at 416, 741 F.Supp. at 942. Accordingly, plaintiff's argument that the Department was compelled to apply the rate from *Ball Bearings* because it was higher must fail.

Defendant responds that some of the information needed to discern the value of the section 28 subsidy from the combined section 28 and section 36 subsidy program is under protective order, and that the administrative burden would be significant. Commerce points out that all the cases cited by Saha that stand for the selection of the highest non-BIA rate were adopted from identical programs. Indeed, there is no case where this rate was adopted from a program that was not identical. *Defendant's Brief* at 18–19. The Court does not view the confidentiality problem as such a barrier in this case, but does agree with defendant that to place such an administrative burden on the Department in every case is not in harmony with the purpose of BIA or the deference afforded by the courts to the agencies in administering the antidumping laws. *See Chemical Products Corp. v. United States,* 10 CIT 626, 628, 645 F.Supp. 289, 291 (1986), *vacated on other grounds,* 10 CIT 819, 651 F.Supp. 1449 (1986). Indeed, the Department's policy of choosing the highest rate that is *published* was designed to avoid the very situation at bar and its accompanying administrative inconvenience. Plaintiff would require that the Department dissect a published combined rate to discern an *unpublished* component of that combined rate, notably the portion of the rate attributable to the section 28 subsidy. The Court will not impose such a burden on the ITA.

In selecting a BIA rate for a given subsidy program, Commerce asserts its practice is to select the highest published non-BIA rate for the *identical* program in the same country. *Defendant's Brief* at 16 (emphasis added). Commerce further maintains that the *Butt–Weld Pipe* rate was the highest for IPA section 28. *Id.* Moreover, this rate was reasonable because it concerned a similar industry and an identical time period as that used for the 1988 Review. *Id.* That there may have been an even more reasonable method or choice is moot because the Court may not substitute its reasonable choice for the reasonable choice of the agency. *See e.g., Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *ICC Industries, Inc. v. United States,* 5 Fed.Cir. (T) 78, 812 F.2d 694 (Fed. Cir.1987). *American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984); *Mitsubishi Materials Corp. v. United States,* —— CIT ——, 820 F.Supp. 608 (1993).

As discussed above, where Congress did not lay out specific guidelines for the Department to follow, Congress left the Department broad discretion in administering the antidumping laws. Congress has not provided the Department with meaningful instruction as to what "best evidence" actually means. In the absence of such guidance, this Court may not require the Department to pry open every case that in some way sheds light on the subsidy at issue in the current administrative review. Commerce's choice of *Butt-weld Pipe Fittings,* from a similar program in a similar time period sufficiently fulfilled the Congressional mandate to obtain the "best information." Commerce was not required to reopen another case and determine the section 28 component of a combined rate issued during a different period in a different industry.

Of at least equal importance, the Department's revised overall rate appears much more accurate than the initial rate used for the preliminary determination. Defendant–Intervenor points out that Commerce itself conceded that its 7.18 percent "all other" rate issued after the Preliminary Determination (which was the culmination of several factors

including the *Butt–Weld Pipe* section 28 rate component) was based upon "unrepresentative and extraordinarily high surrogate data." *Defendant–Intervenor Memorandum* at 3, *citing* 56 Fed.Reg. at 50, 853. Therefore, the Department has honored one of the fundamental principles underlying the trade statute—accuracy. It is this endeavor for accuracy, within the limits of strict deadlines, that lends respectability to U.S. trade statutes in the international community. Indeed, as the defense points out, Commerce has been instructed by this Court and the Federal Circuit to seek to avoid the use of unrepresentative or extraordinarily high surrogate data as BIA. *See N.A.R., S.p.A. v. U.S.*, 14 CIT at 416–18, 741 F.Supp. at 942–43 (detailed discussion of what constitutes BIA); *Olympic Adhesives Inc. v. U.S.*, 8 Fed.Cir. (T) 69, 76, 899 F.2d 1565, 1572 (Fed.Cir.1990) (BIA rates may not be arbitrary).

Had Commerce selected the 19.38 percent rate from *Ball–Bearings* rather than the 1.89 percent rate from *Butt-weld Pipe Fittings,* it would have contradicted its above-cited efforts to use more representative data regarding the programs other than section 28 that were reassessed after the preliminary review. In any event, Commerce has satisfied the guidelines for BIA set forth in *N.A.R.*

### 3. Country-wide Rate

■ Finally, Commerce maintains that its decision not to grant Saha a company-specific rate was within its discretion and the relevant statutory and regulatory framework. *See,* 19 U.S.C. § 1671e(a)(2)(A) (1992); 19 C.F.R. § 355.22(d)(2) & (3) (1992). Section 1671e(a)(2) provides that the countervailing duty rate shall apply uniformly to all merchandise of the same kind exported from the country under investigation unless "the administering authority determines there is a significant differential between companies receiving subsidy benefits." *See* 19 U.S.C. § 1671e(a)(2)(A).

This Court discussed this statutory provision and its legislative history thoroughly in *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 406, 636 F.Supp. 961, 968–69 (1986); See also, *Ipsco, Inc. v. United States,* 8 Fed.Cir. (T) 80, 84–86, 899 F.2d 1192, 1194 (1990); *Cementos Anahuac Del Golfo, S.A. v. U.S.,* 12 CIT 401, 411, 687 F.Supp. 1558, 1567 (1988), *rev'd on other grounds,* 7 Fed.Cir. (T) 113, 879 F.2d 847 (1989). This Court has held that the statute establishes a preference for the employment of country-wide rates by the agency. This preference appears to stem largely from the fear of the administrative burden potentially placed on agencies with limited resources and strict time constraints were the agency to attempt to determine the actual benefit received by each firm and then set company-specific rates. *See H.R.Rep. No. 1156, 98th Cong., 2d Sess. 180, reprinted in 1984 U.S.Code Cong. & Admin.News 4910, 5297; Ceramica,* 10 CIT at 406, 636 F.Supp. at 968. Thus it is the general practice of the ITA, as encouraged by the statute, to calculate a country-wide duty rate. "Country-wide rates are particularly useful where … a large number of companies are involved." *Ceramica,* 10 CIT at 406, 636 F.Supp. at 968.

Several factors distinguish the case at bar from *Ceramica.* In *Ceramica,* the ITA expressed concern about administrative burden, and tracking down a multitude of companies within strict deadlines. In the case at bar, very few companies are involved. Rather there are six companies, one of which cooperated fully, thereby alleviating the administrative burden. In fact, the company-specific rate has *already* been calculated at the preliminary determination for this company, Saha Thai, in part due to its cooperation.

Saha understandably feels it has been punished as the sole company that cooperated with the Administration in order to achieve a more accurate rate. At oral argument, defendant countered that the country-wide rate is particularly suited for countervailing duty determinations as a means to punish the behavior of the *country,* once it has been established that country's companies are trading unfairly under the statute. According to this theory, the state practicing unfair subsidization is on notice that it is putting companies such as Saha at economic risk. Presumably it would then be up to the aggrieved company to complain to its government for an upward adjustment of its actual

benefit to reach the assessed country-wide rate, or, in the alternative, decline the benefit altogether in the future.

Defendant cited *Ipsco* generally at oral argument for the proposition that Congress especially expressed a preference for country-wide rates in cases of subsidization because of the state conduct. *See Ipsco,* 8 Fed.Cir. (T) at 86, 899 F.2d at 1197, *citing* 53 Fed.Reg. 52,306, 52,325 ("Unlike the antidumping law, which is directed to company-specific activity, the countervailing duty law is directed at government or government-sponsored activity.")

Section 355.22(d) of 19 C.F.R. provides the following:

(2) If the Secretary decides that an individual (including government-owned) producer or exporter received a significantly different net subsidy during the period, the Secretary will state in the final results an individual rate for that person, and that rate will be the basis for the assessment of countervailing duties and, except as provided in paragraph (c)(7)(iii) of this section, the cash deposit of estimated countervailing duties for that person.

(3) A significant differential is:

(i) A difference of the greater of at least five percentage points, or 25 percent, for the weighted-average net subsidy calculated on a country-wide basis; or

(ii) The difference between a net subsidy of zero (or *de minimis* ) and any rate greater than *de minimis.*

After the adjustment, Saha's rate was within the permissible five percentage points determining the application of a country-wide rate. Had Commerce applied the 19.38 percent rate from *Ball Bearings* for IPA section 28 to the non-responding exporters, the weighted average countervailing duty rate would have exceeded 10.00 percent. Since Saha's individual benefit rate was only .90 percent, Commerce would have concluded that the benefit received by Saha was "significantly different" and published the original .90 percent rate. The Department's practice of setting the scope of the country-wide rate as

including all rates within five percent is well established and reasonable. The Court may not reverse the Department when it has followed its own reasonable regulations, even though the result may appear cruel to plaintiff.

Although the Court is mindful of the important policies of admonishing countries who subsidize and reducing the burden of assessing individual rates, Commerce's decision to include Saha in the country-wide rate operates as a *de facto* penalty on Saha, the one company that cooperated fully in the investigation underlying this review. Counsel for defendant was not able to cite any other case where a company had fully cooperated in the review, was assessed a low company rate at the preliminary determination, and then was pooled at a higher country-wide rate. The Court requested that defendant provide it with such information if it existed and has received nothing to date. Likewise research has not brought any analogous situation to light in the reported cases. Although the Court finds that the rate assessments were supported by substantial evidence and otherwise in accordance with law, defendant is urged but not ordered to reconsider its decision to include Saha in the country-wide rate, and favor accuracy and cooperation by restoring Saha's individual rate of .90 percent established in the preliminary determination.

As noted above, the opposing policy concern of administrative feasibility has been cured in this case because Saha's rate has been determined with precision previously, in part due to its cooperation.[8] The alternative policy suggested by defendant, that the country-wide rate was designed to punish the country, regardless of incidental effects on individual companies, is not reflected in the statute or a fair reading of *Ipsco.*

For the reasons set out above, the Court finds that it would be equitable to restore plaintiff's .90 percent rate. However, defendant's actions in this matter are in accordance with law. Accordingly, judgment is entered for defendant, and this case is dismissed.

---

**8.** The Department would ultimately be administering a mere two rates for the entire industry,

one for the cooperating company and one country-wide rate for the non-cooperating companies.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED,** and **DE-CREED** that the determination of the International Trade Administration, United States Department of Commerce is affirmed; and it is further

**ORDERED, ADJUDGED,** and **DE-CREED:** that this action be and the same hereby is dismissed.