**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs,**

v.

**The UNITED STATES and The United States Department of Commerce, Defendants,**

and

**The Torrington Company; Federal-Mogul Corporation, Defendant-Intervenors.**

Slip Op. 95–146.
Court No. 92–07–00505.

United States Court of International Trade.

Aug. 16, 1995.

Powell, Goldstein, Frazer & Murphy, Washington, DC (Peter O. Suchman, Neil R. Ellis, T. George Davis, Robert A. Calaff and Niall P. Meagher), for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Marc E. Montalbine); of counsel: Stephen J. Claeys, Stacy J. Ettinger and Dean A. Pinkert, Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC, for defendants.

Stewart and Stewart, Washington, DC (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Lane S. Hurewitz, Patrick J. McDonough and John M. Breen), for defendant-intervenor, The Torrington Company.

Frederick L. Ikenson, P.C., Washington, DC (Frederick L. Ikenson, Larry Hampel and Joseph A. Perna, V), for defendant-intervenor, Federal–Mogul Corporation.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), challenge certain aspects of the Department of Commerce, International Trade Administration's ("Commerce") final results of the administrative review of certain antifriction roller bearings ("AFBs") from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews*, 57 Fed.Reg. 28,360 (June 24, 1992), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 57 Fed. Reg. 59,080 (December 14, 1992) (collectively, *"Final Results"*).

### Background

On May 15, 1989, Commerce published antidumping duty orders which covered the subject merchandise. *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 20,900 (May 15, 1989). On March 31, 1992, Commerce published the preliminary results of its second administrative reviews, for the period May 1, 1990 to April 30, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Adminis-*

*trative Reviews,* 57 Fed.Reg. 10,859 (March 31, 1992).

On June 24, 1992, Commerce published the final determination of its second administrative review, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 28,360 (June 24, 1992), which was later amended by *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed.Reg. 59,080 (December 14, 1992).

Koyo moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record, alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) use of best information available ("BIA") where Koyo failed to provide cost of production ("COP") data for home market prototype models; (2) application of BIA to scope products which were sold to a U.S. affiliate which incorporated the products into non-scope finished merchandise; (3) exclusion of the provision for doubtful debt from the home market indirect selling expenses; (4) application of the difference in merchandise "difmer" test; and (5) failure to add direct selling expenses to foreign market value ("FMV"). *Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Judgment on the Agency Record ("Koyo's Brief")* at 3–6.

### Discussion

The Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

A final determination by Commerce in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217,

83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

### 1. *Missing Cost of Production Data*

■ Koyo contends that Commerce improperly resorted to BIA to calculate the dumping margins for any U.S. sale that matched to home market models for which COP data was missing or that matched to a "family" of home market models if COP for any model within that family was missing. In addition, Koyo asserts Commerce applied an unreasonable BIA because Koyo failed to provide only a small amount of cost data for very few home market models (an "extremely insignificant portion of the COP data") and because the absence of the data would have had virtually no impact on its margin calculation. Koyo states Commerce acted inconsistently by applying a punitively high margin rate for all U.S. sales which matched either the individual home market models which included the sub-models with missing COP data or the entire home market families that included those models. Further, Koyo maintains the factors distinguishing the models lacking COP data from other home market bearing sub-models comprising a given model accounted for no more than a "nominal cost difference." *1990–1991 AFB Questionnaire* at 41–42; *Koyo's Brief* at 12–20.

Commerce responds that it correctly resorted to BIA because Koyo failed to provide pertinent data and that it properly used Koyo's rate from the less-than-fair value ("LFTV") investigation as BIA. *Defendants' Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendants' Brief")* at 14–24.

Defendant-intervenor The Torrington Company ("Torrington") and defendant-intervenor Federal–Mogul Corporation ("Federal–Mogul") agree with Commerce's position on this issue. *Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Torrington's Brief")* at 14–22; *Opposition of Federal–Mogul Corporation, Defendant–Intervenor, to Motion of Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation*

*of U.S.A. for Judgment on the Agency Record ("Federal–Mogul's Brief")* at 7–13.

Section 1677e(c) of Title 19, U.S.C., states that Commerce "shall, whenever a party ... refuses or is unable to produce information requested in a timely manner ... use the best information otherwise available."

Koyo's argument that Commerce improperly applied BIA because Koyo failed to provide only a very insignificant portion of the data requested is without merit. The BIA provision applies regardless of the amount of lacking information. *See* 19 U.S.C. § 1677e(c) (1988).

For purposes of this administrative review, Commerce required that Koyo provide complete COP data for all reported home market sales. *1990–1991 AFB Questionnaire; Koyo's Brief* at 12. It is undisputed that Koyo did not provide all the information that had been requested. Therefore, BIA was correctly applied because Commerce specifically requested Koyo to provide COP data and Koyo failed to do so. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984), *cited in, U.H.F.C. Co. v. United States,* 13 CIT 119, 129, 706 F.Supp. 914, 922 (1989), *aff'd in part, rev'd in part,* 916 F.2d 689 (Fed.Cir.1990), *vacated and remanded,* 14 CIT 753 (1990); *see also, Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1190 (Fed.Cir.1993).

■ Upon review, this Court finds that Commerce properly selected Koyo's LTFV investigation rate as BIA. The Court finds that the antidumping statute is silent as to what constitutes best information available. 19 U.S.C. § 1677e. Because Congress explicitly left a gap for the agency to fill, it is within Commerce's discretion to decide what constitutes best information available in a particular case and this Court must grant that decision considerable deference. *Allied–Signal Aerospace,* 996 F.2d at 1191–92. It is therefore within Commerce's discretion to choose BIA adverse to noncooperating parties. *Saha Thai Steel Pipe Co. v. United*

*States,* 17 CIT 727, ——–——, 828 F.Supp. 57, 62–64 (1993).

This Court finds that Commerce exercised its discretion in this matter reasonably and in accordance with law. Commerce explained its choice of BIA:

> Koyo failed to provide COP information for certain models. We will use Koyo's reported data to the extent possible for calculating cost of production. However, where those models for which no COP information was provided are shown to be the most appropriate match for a U.S. sale, we have applied Koyo's rates of 73.55 percent for BBs and 51.21 percent for CRBs from the LTFV investigation as BIA. In addition, where any of these models belonged to a family which was used as a match, these BIA rates were applied to the family.

*Final Results,* 57 Fed.Reg. at 28,386.

Therefore, this Court finds that Commerce's application and choice of BIA in this case is supported by substantial evidence and in accordance with law and is hereby affirmed.

### 2. "Roller Chain" Exclusions

■ Koyo asserts Commerce acted contrary to law by applying BIA to certain of Koyo's claimed "Roller Chain" exclusions.[1] Koyo argues it has been unreasonably punished for its inability to obtain information from a U.S. affiliate who refuses to provide information to Koyo and whose corporate relationship to Koyo is extremely tenuous. Koyo also requests that Commerce not apply the "Roller Chain" principle so rigidly, asserting its "Roller Chain" exclusion denied by Commerce exceeded the one percent threshold by only "a tiny amount." In addition, Koyo contends the choice of BIA, the BIA rate applied to Koyo in the LTFV investigation, had a dramatically disproportionate impact on Koyo's dumping margin in this review. *Koyo's Brief* at 20–36.

Commerce responds that it properly decided to apply BIA for the transactions which

---

1. Imports of scope merchandise are not subject to antidumping duties if they comprise less than one percent of the sales value of the finished product sold to unrelated customers in the Unit-

ed States. *See Roller Chain, Other Than Bicycle, From Japan; Final Results of Administrative Review of Antidumping Finding,* 48 Fed.Reg. 51,-801, 51,804 (Nov. 14, 1983).

Koyo inappropriately claimed as "Roller Chain" transactions. Commerce states it accepted some of Koyo's claimed exclusions, but could not accept those which fell below the threshold or for which Koyo did not furnish appropriate data. Accordingly, in those cases, Commerce resorted to BIA. Commerce asserts its choice of BIA was proper and that there is nothing necessarily punitive about the use of rates from previous segments of the proceeding. *Defendants' Brief* at 24–34. Defendant-intervenors agree with the position taken by Commerce.

This Court finds that Commerce properly denied a "Roller Chain" exclusion in this case: the claimed exclusion in dispute exceeds the one percent threshold established by Commerce. *Final Results,* 57 Fed.Reg. at 28,378–79; *see Roller Chain,* 48 Fed.Reg. at 51,804.

■ It is undisputed that Commerce instructed Koyo to provide information regarding imported scope products (bearings and bearing parts) that were sold to U.S. affiliates that used those products to manufacture merchandise outside the scope of the order before the first sale to an unrelated customer. *1990–1991 AFB Questionnaire* at 11. It is also undisputed that Koyo failed to provide the information requested. *Koyo's Brief* at 26–31. Therefore, the application of BIA is appropriate under these circumstances. *See discussion of issue no. 1, supra.*

Koyo's argument that its tenuous relationship with its affiliate prevents Koyo from providing the requested information is without merit. The BIA provision applies regardless of the noncomplying party's reason for non-compliance. *See* 19 U.S.C. § 1677e(c) (Commerce "shall, whenever a party … refuses *or is unable* to produce information requested … use the best information otherwise available.") (Emphasis added.)

■ It is also undisputed that the BIA rate used by Commerce, that applied to Koyo in the LTFV investigation, is the highest rate previously applied to Koyo. *Koyo's Brief* at 30. Koyo's argument that Commerce's choice of BIA is improper is also without merit. *See discussion of issue no. 1, supra.*

This Court finds that Commerce exercised its discretion in this matter reasonably and in accordance with law. Commerce explained its choice of BIA:

> When a company substantially cooperated with our requests for information … but failed to provide the information requested in a timely manner or in the form required, we used as BIA the higher of (1) the highest rate … ever applicable to the firm for the same class or kind of merchandise from either the LTFV investigation or a prior administrative review; or (2) the highest calculated rate in this review for the class or kind of merchandise for any firm from the same country of origin.

*Final Results,* 57 Fed.Reg. at 28,379.

Therefore, this Court finds that Commerce's denial of a "Roller Chain" exclusion and application and choice of BIA in this issue is supported by substantial evidence and in accordance with law and is hereby affirmed.

### 3. *Indirect Selling Expenses for Doubtful Debt*

■ Koyo contends Commerce unlawfully excluded Koyo's provision for doubtful debt from home market indirect selling expenses. Koyo alleges Commerce did so contrary to Commerce's previous practice and to judicial precedent. Koyo cites *AOC Int'l, Inc., Fulet Elec. Indus. Co., Sampo Corp., and Tatung Co. v. United States,* 13 CIT 716, 721 F.Supp. 314 (1989), and *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 712 F.Supp. 931 (1989), *aff'd in part and rev'd in part, remanded,* 6 F.3d 1511 (Fed.Cir.1993), for the proposition that this Court should specifically require Commerce to accept a bad debt reserve as an indirect selling expense. *Koyo's Brief* at 36–39.

Commerce argues it properly excluded Koyo's claimed expenses for doubtful debt. Commerce states it had requested clarification as to whether Koyo's initial response for allowance for bad debts represented money that was set aside to cover doubtful accounts or whether it represented actual losses. Based on Koyo's response that it represented monies "set aside," *Koyo's Supplemental Re-*

*sponse, Public Doc. 493* at 44–45, Commerce denied Koyo's claim for an adjustment. Commerce distinguished between actual losses and cash reserves for bad debt. *Defendants' Brief* at 34–38. Defendant-intervenors concur with defendants.

The Court agrees with Commerce's argument. While it is Commerce's practice to make allowance for bad debt that is incurred on the sale of subject merchandise, this is not the case here. The case at bar involves a reserve account, an amount set aside for doubtful accounts, *not* actual losses due to bad debt. Accordingly, Commerce denied the provision from home market indirect selling expenses. Commerce explained:

> The Department considers bad debt that is actually incurred on the sale of subject merchandise during the period of review to be either a direct or indirect selling expense depending on the relationship between the bad debt expense and the sale.... However, in this case, Koyo has claimed an amount in a reserve account which is set aside in the event that an actual expense is incurred. Koyo has shown no relationship between this account and ·actual sales. Therefore, we have disallowed Koyo's doubtful debt expense for these final results.

*Final Results,* 57 Fed.Reg. at 28,412.

It is for this reason as well that Koyo's reliance on *AOC* and *Daewoo* is misplaced. These cases involve bad debt expenses (actual losses previously incurred by respondents) not, as in this case, bad debt reserves (cash set aside in the event an actual bad debt expense is incurred in the future). *AOC,* 13 CIT 716, 721 F.Supp. 314, and *Daewoo,* 13 CIT 253, 712 F.Supp. 931.

Because Koyo has failed to show that it incurred actual bad debt losses or that any relationship exists between its doubtful debt account and sales of subject merchandise, this Court finds Commerce properly excluded Koyo's claimed expenses for doubtful debt from home market indirect selling expenses and hereby affirms Commerce on this issue.

### 4. Difference in Merchandise Test

■ Koyo asserts Commerce erred in applying the twenty percent difference in merchandise ("difmer") cap, by failing to determine whether the difference between the variable cost of manufacturing ("VCOM") of the U.S. model and the VCOM of each model in the home market "family" of models matched to that U.S. model exceeded twenty percent of the VCOM of the U.S. model. Koyo contends Commerce thus failed to eliminate "outlying" models from the home market family and to ensure that the family consisted only of models that were of equivalent commercial value, as required by the statutory definition of similar merchandise in 19 U.S.C. § 1677(16) (1988). According to Koyo, Commerce's methodology was flawed because Commerce calculated a single VCOM for each bearing family and used this figure for the entire family match against the VCOM of the individual U.S. model. Koyo states Commerce should have applied the resulting difmer cap to each of the bearing models within each home market "family" of bearings. *Koyo's Brief* at 39–41.

Commerce contends its methodology of applying a twenty percent difmer cap for comparing a bearing sold in the U.S. and a family of bearings sold in the home market is reasonable and in accordance with law. Commerce asserts its use of a bearing family's weighted-average VCOM to apply the difmer test ensures that all of the bearings within the family, as a whole, are comparable to the U.S. bearing. *Defendants' Brief* at 4–14.

■ When identical merchandise is not available in the home market for comparison with the merchandise sold to the United States, Commerce must select "similar" comparison merchandise based upon the physical characteristics of the merchandise being compared. 19 U.S.C. § 1677(16).[2] Com-

---

**2.** 19 U.S.C. § 1677(16) (1988) provides:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination

for the purpose of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics

merce has been granted broad discretion to devise a methodology for determining what constitutes "similar" merchandise. *E.g., Smith–Corona Group v. United States,* 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

In this review, Commerce developed a "family" matching methodology to identify similar merchandise when there were no foreign market sales of merchandise identical to a U.S. sale. *Defendants' Brief* at 6. For those cases, Commerce determined what constituted "similar merchandise" by grouping bearings into families based upon eight specified physical characteristics. *Final Results* 57 Fed.Reg. at 28,367. In addition, Commerce employed a twenty percent difmer cap so that bearings having a greater than twenty percent difference in their VCOM would not be treated as similar. *Id.* When a bearing sold in the U.S. was compared to a family of bearings sold in the home market, the difmer test was applied by comparing the VCOM of the bearing sold in the U.S. with a weighted-average of the VCOM for each of the constituent bearings within the corresponding bearing family. *Id.* Thus, Commerce treated each bearing family as if it were a single model both for identifying the most similar merchandise and for using the sales of the family's constituent bearings in determining FMV. *Defendants' Brief* at 6–7.

Upon review, this Court finds that Commerce's model matching methodology was reasonable and in accordance with law and that Commerce acted within its discretion in its choice of methodology. *See Smith–Corona,* 713 F.2d at 1571. Accordingly, Commerce is hereby affirmed on this issue.

### 5. *U.S. Direct Selling Expenses*

██  Koyo asserts Commerce erred in treating Koyo's U.S. direct selling expenses as a reduction to U.S. price ("USP") rather than an addition to foreign market value on exporter's sales price ("ESP") sales. Koyo's states direct selling expenses should be added to FMV as a matter of law and Commerce acted contrary to the statute and to explicit direction from this Court in deducting them from USP. *Koyo's Brief* at 41–43.

While conceding that this Court has ruled adversely to its position on this point, Commerce contends it has acted consistently with 19 U.S.C. § 1677a(e)(2) (1988), rather than adding direct selling expenses to FMV pursuant to the circumstance of sale adjustment contained in 19 U.S.C. § 1677b(a)(4)(B) (1988). *Defendants' Brief* at 38–42.

Commerce's policy has recently been vindicated by the Federal Circuit in *Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A. v. United States,* 36 F.3d 1565 (Fed.Cir.1994). The Federal Circuit explained Commerce's practice as follows:

> Commerce's practice evidences an attempt to make mirror-image adjustments to foreign market value and exporter's sales price so that they can be fairly compared at the same point in the chain of commerce. The procedure is as follows: In an exporter's sales price transaction, after an initial exporter's sales price is calculated, that value is adjusted, *inter alia,* pursuant to section 1677a(e)(2) by deducting therefrom all selling expenses (both direct and indirect) incurred in making U.S. sales. Then, in determining an initial foreign market value, appropriate sales are identified in the home market or third country pursuant to 19 U.S.C. § 1677b(a). Next, the initial foreign market value is adjusted, *inter alia,* by deducting therefrom a "circumstances of sale" amount to account for

---

with, and was produced in the same country by the same person as, that merchandise.
**(B)** Merchandise—
**(i)** produced in the same country and by the same person as the merchandise which is the subject of the investigation,
**(ii)** like that merchandise in component material or materials and in the purposes for which used, and
**(iii)** approximately equal in commercial value to that merchandise.

**(C)** Merchandise—
**(i)** produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
**(ii)** like that merchandise in the purposes for which used, and
**(iii)** which the administering authority determines may reasonably be compared with that merchandise.

"any difference between the United States price and the foreign market value," 19 U.S.C. § 1677b(a)(4), for example, direct selling expenses incurred in making home market sales. In this way, the section 1677b(a)(4) adjustment to foreign market value counterbalances the section 1677a(e)(2) adjustment to exporter's sales price. As a result, the two parameters may be compared on equivalent terms.

*Koyo Seiko,* 36 F.3d at 1573.

The Federal Circuit went on to specifically uphold Commerce's reading of the statute:

> Nothing in the plain language or the legislative history of the Antidumping Act precludes Commerce's approach of adjusting exporter's sales price by deducting therefrom certain direct selling expenses incurred in the United States. Indeed, Commerce's stated rationale for its approach is well within the bounds of reasonableness. Moreover, because we recognize that Commerce is "the 'master' of the antidumping law, worthy of considerable deference," *Daewoo Elecs.,* 6 F.3d at 1516, we defer to its approach.

*Id.* at 1575.

Accordingly, as the law is now clear that Commerce's methodology of adjusting United States price for selling expenses, both direct and indirect, incurred with respect to ESP sales, is reasonable and in accordance with law, this Court affirms Commerce on this issue.

### Conclusion

In accordance with the foregoing opinion, this Court, after due deliberation and a review of all papers in this action, finds that Commerce's actions were in accordance with law and supported by substantial evidence. For the reasons stated above, the Final Results are affirmed and plaintiffs' motion is denied in all respects. This case is hereby dismissed.