**U.H.F.C. COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 83–11–01598.

United States Court of International Trade.

Feb. 14, 1989.

Neville, Peterson & Williams and John M. Peterson, for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Elizabeth C. Seastrum, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

MUSGRAVE, Judge.

### BACKGROUND

This lawsuit was commenced in accordance with Section 516A of the Tariff Act, *as amended*, 19 U.S.C. § 1516a, to seek review of a final determination of the U.S. Department of Commerce, International Trade Administration (ITA) in a 19 U.S.C. § 1675(a) administrative review of Treasury Decision 78–2, an outstanding Finding of Dumping against *Animal Glue and Inedible Gelatin from the Netherlands.* Notice of the contested determination was published in the *Federal Register* on October 6, 1983. 48 Fed.Reg. 45583–84.

The administrative review which is the subject of this lawsuit covered entries of *Animal Glue and Inedible Gelatin from the Netherlands* made during the period from December 1, 1980 through November 30, 1981. Through their review, ITA determined that antidumping duties in a weighted average amount of 24.60% *ad valorem* should be collected on entries made during that period of animal glue manufactured in the Netherlands by B.V. Lijmfabriek C. Trommelen ("Trommelen"). Plaintiff, who imported substantial quantities of such animal glue during the period covered by the review, challenges the manner in which ITA determined foreign market value with respect to entries of Trommelen merchandise during the period of review. The court has jurisdiction under 28 U.S.C. § 1581(c) (1982).

### FACTS

A. *Description of Subject Merchandise*

This case concerns the appraisement under the antidumping law of various grades of animal glues, of which there are two principle types: hide glue and bone glue. The glues which are the subject of this lawsuit are hide glues.

The production process for a particular hide glue will depend upon the raw material used. Where glue is produced from "hide-cuttings" (e.g. headskins) and/or

"splits" (i.e., waste parts generated by the "splitting" of hides during the tanning process), the hide-cuttings and splits are stored in a solution which has the effect of hydrolyzing the insoluble collagen in the raw materials into water-soluble proteins. Afterwards, the treated materials are submitted to a "washing" process, which is repeated several times, which permits the soluble proteins to be extracted from the prepared raw materials. The diluted glue solution which results is thereafter concentrated and dried. Proteins extracted during the first washing produce glue of the highest quality and strength; each successive washing yields successively weaker glues.

A third type of raw material used in the production of hide glues is "fleshings" (i.e., connective tissues scraped from a hide during the tanning process). Because "fleshings" have a different molecular structure than either "hide-cuttings" or "splits", they are processed separately in a process which yields glue-water, which is then distilled into glue.

Animal glues are graded on the basis of comparative jelly and viscosity values. Jelly-strength is measured in "Bloomgrams" and ranges from 30 bloomgrams (weak jelly) to approximately 500 bloomgrams (very strong jelly). Viscosity measurements range from 25 millipoises (watery glue) to about 200 millipoises (very viscous glue).

Glue is priced according to its jelly-strength; glues of high jelly-strength generally command a higher price than those of lesser jelly strength. A glue's strength depends on the characteristics of the particular raw materials used, and generally cannot be determined by measurement until after manufacture.[1]

Depending upon its strength, animal glue is used for a variety of purposes such as a general adhesive, an abrasive, or as a sizing agent (i.e., glaze or filler).

B. *The Contested Determination*

On December 23, 1976 representatives of the United States industry engaged in the manufacture of animal glue and inedible gelatin filed a petition with the Secretary of Treasury ("Treasury") seeking the imposition of antidumping duties against animal glue and inedible gelatin imported from the Netherlands and three other nations. On August 3, 1977 Treasury determined that animal glue and inedible gelatin from the Netherlands was being sold in the United States at less than fair value (LTFV). 42 Fed.Reg. 39289–90. On October 31, 1977 the U.S. International Trade Commission ("ITC") determined that an industry in the United States was being or was likely to be injured by reason of such LTFV imports from the Netherlands. 42 Fed.Reg. 57565. On December 22, 1977 Treasury promulgated Treasury Decision 78–2, a Finding of Dumping against *Animal Glue and Inedible Gelatin from the Netherlands.* 42 Fed.Reg. 64115.

On January 2, 1980 authority for administering the antidumping law was transferred from Treasury to the Commerce Department pursuant to the Trade Agreements Act of 1979. Since 1980, ITA has conducted three Section 751(a) reviews of Treasury Decision 78–2. Final results of the second such review (which is the subject of this action) encompassed entries made from December 1, 1980 through November 30, 1981, and were published in the Federal Register on October 6, 1983. 48 Fed.Reg. 45583–84. During the period from December 1, 1980 to November 30, 1981 Trommelen sold to plaintiff U.H.F.C. (an unrelated U.S. glue importer) animal hide glues of the following bloomgram strengths: 250, 350, 365, 380, and 450. (R. 74–75.) Trommelen's sales in the Netherlands were of glues having bloomgram strengths of 150, 170, 190, 210, 220, 230, 260, 290, 300, and 400. (R. 64–66.)

On December 21, 1981 an antidumping questionnaire was mailed to Trommelen,

---

1. Glues of different strengths are often blended in straight mathematical proportions to yield a mixture of desired quality. Thus, an order for 200 pounds of glue of 300 bloomgrams could be filled by mixing 100 pounds of 250 bloomgram glue with 100 pounds of 350 bloomgram glue. (Plaintiff's Brief at 8.)

which was granted an extension of the deadline for its questionnaire response until February 26, 1982. (R. 42.) The response, which was received on March 1, 1982 (R. 57), requested that foreign market value be calculated using sales to third countries (Rumania and the United Kingdom). The response stated that Trommelen's Netherlands (home market) sales accounted for 4.9% of its total sales during the period under review. (R. 58.) Trommelen also reported that "[jelly strength] expressed in bloomgrams is determining [sic] the price," along with certain other factors. (Defendant's Brief at 6.)

Trommelen submitted a supplemental questionnaire response to the ITA on August 13, 1982, claiming price adjustments based upon the differences between the quantity of sales in the home country and the U.S., and because of differences in jelly-strength. The price lists of other companies were submitted by Trommelen in support of its claim for price adjustments. The ITA requested further information about the claimed adjustments, which information Trommelen did not, or was not able to, supply.

The ITA published the preliminary results of its review on January 17, 1983. 48 Fed.Reg. 2030. In calculating the foreign market value, ITA

> "used home market price, as defined in Section 773(a) of the Tariff Act, since sufficient quantities of such or similar merchandise were sold in the home market to provide a basis for comparison. Home market price was based on the delivered price with adjustments for inland freight and differences in the packing costs, where applicable.
> [ITA] denied a claimed adjustment for differences in the merchandise, since no data quantifying home market difference was supplied. No other adjustments were claimed or allowed." (R. 151–152.)

Trommelen's duty rate was preliminarily found to be 23.7%.

In calculating the fair value margins of Trommelen's products ITA compared U.S. glue sales of 250 bloomgrams with home market glues of 300 bloomgrams, and U.S.

sales of 350, 365, 380, and 450 bloomgrams with home market sales of 400 bloomgrams. (R. 134.) There were no home market sales of the same glue strength as U.S. sales.

The ITA issued its final results of the review on September 28, 1983. 48 Fed. Reg. 45583. The dumping margin for Trommelen's products was found to be 24.60%. The agency based the margin upon the same comparisons as those made in the preliminary results of review, as the best information available. (R. 244.)

## ISSUES PRESENTED

This case presents three issues for review:

1) Whether the ITA's decision to base its determination of foreign market value upon home market sales is supported by substantial evidence and is otherwise in accordance with law?

2) Assuming that Trommelen's home market sales were an adequate basis for determining foreign market value, whether ITA's denial of an adjustment to foreign market value for physical differences in the merchandise is supported by substantial evidence and is otherwise in accordance with law?

3) Whether ITA's use of sales of 300 bloomgram glue as the basis for determining foreign market value for grade 250 glue was in accordance with law?

## DISCUSSION

The Antidumping Act provides that if foreign merchandise is sold or is likely to be sold in the United States at less than fair value, to the material injury of a U.S. industry, then an antidumping duty shall be imposed. 19 U.S.C. § 1673. The amount of the duty shall equal the amount by which the foreign market value exceeds the United States price for the merchandise. *Id.*

Foreign market value is computed by one of three methods: (1) home market sales; (2) third country sales; or (3) constructed value. 19 U.S.C. § 1677b(a). The preferred method is the first mentioned—"the

price, at the time such merchandise is first sold within the United States ... at which such or similar merchandise is sold, or in the absence of sales, offered for sale in the principal markets of the country from which exported ... for home consumption." 19 U.S.C. § 1677b(a)(1)(A). Only if such or similar merchandise is not "sold or offered for sale for home consumption, or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an adequate basis of comparison" may the ITA compute foreign market value using prices at which such or similar merchandise is sold for export to third countries or by use of constructed value. 19 U.S.C. § 1677b(a).

The term "such or similar merchandise" is defined in Section 771(16) of the 1930 Tariff Act, *as amended*, 19 U.S.C. § 1677(16), in a fashion which is also hierarchical:

(16) Such or similar merchandise.—The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

1.  Whether the ITA's decision to base its determination of foreign market value upon home market sales is supported by substantial evidence and is otherwise in accordance with law?

(A) *Whether the merchandise sold in the home market was "similar" to that sold in the U.S.?*

■ Both parties agree that Trommelen did not make any home market sales of identical ("such") merchandise during the period under review. The next inquiry, then, is whether Trommelen sold glues in the Netherlands which were "similar" to those exported to the United States, within the meaning of 19 U.S.C. § 1677(16)(B) or (C).

During the period of review Trommelen sold for export to the U.S. glues having jellystrengths of 250, 350, 365, 380, and 450 bloomgrams, while its home market sales were of jellystrengths of 150, 170, 190, 210, 220, 230, 260, 290, 300, and 400 bloomgrams (R. 63–65). Plaintiff contends that the glues used for the basis of the comparison were not "similar", and that the ITA should have relied on Trommelen's third country sales of identical glues in determining foreign market value.

Because plaintiff contends that the glues sold in the home market were not similar to those sold in the U.S. it is necessary only for one of the three definitions set out in Section 1677(16) to apply in order for defendant to prevail on this issue. Thus we need look only to the most general definition of "such or similar merchandise", which is set out in part (C) of the statute.

The first part of that definition requires that the merchandise be produced in the same country, and by the same person, and

be of the same general class or kind as the merchandise which is the subject of the investigation. The merchandise considered by the ITA was animal glue. While the glues compared were of different quality grades, it cannot be disputed that the two products were of the same general class or kind. Likewise, it is undisputed that the glues were produced in the same country and by the same person, all the glues in question having been produced by Trommelen in the Netherlands. Thus the first criterion of the definition is satisfied.

The second criterion is that the merchandise be like the merchandise which is the subject of the investigation in the purposes for which used. Plaintiff contends that the glues being compared are not used for like purposes, asserting, for example, that 250 bloomgram glue is used primarily in the manufacture of sand paper and similar abrasive products, while 300 bloomgram glue is used by the paper industry as a sizing material. As defendant points out, however, plaintiff is focusing on a single dissimilar use of these two glues, and ignoring the many common uses to which these glues may be put. Thus, the second criterion of Section 1677(16)(C)'s definition is deemed satisfied.

The final criterion is that the merchandise be merchandise which the administering authority determines may reasonably be compared with that which is the subject of the investigation. As stated in *Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.* 753 F.2d 1033 (Fed.Cir.1985), the Secretary of Commerce has been entrusted with the responsibility for implementing the antidumping law and has broad discretion in its execution. Furthermore, "the Secretary's interpretation of the statute need not be the only reasonable interpretation or the one which the Court views as the most reasonable." *Id.* at 1039. Given the evidence on the record, the Court finds that the ITA did not abuse its discretion in determining that the glues used as the basis for its comparison may reasonably have been compared.

In short, it is the opinion of the Court that the glues sold in the Netherlands and in the U.S. were "similar" within the meaning of Section 1677(16)(C).

(B) *Whether there were sufficient home market sales to serve as a basis for determining foreign market value?*

■ Although 19 U.S.C. § 1677b(a)(1)(B) states that home market sales may not be used as the basis for establishing foreign market value "if ... the quantity sold for home consumption is so small in relation to the quantity sold for exportation ... as to form an inadequate basis for comparison ...", the statute does not state a necessary minimum requirement for the quantity of home market sales. However, section 353.-4(a) of the Commerce regulations, 19 C.F.R. § 353.4(a), provides that home market sales must normally equal at least five percent of the amount of sales to third countries to be an adequate basis for determining foreign market value.

Trommelen's home market sales of glue for the period under review were equal to 6.07% of third country sales by volume. (R. 70.) Plaintiff admits that this figure appears to be within the "five percent rule" of 19 C.F.R. § 353.4(a), but argues that this is not in itself dispositive of the question, stating that the regulation "is not absolute, but is a purely artificial formulation which is intended merely as a 'rule of thumb.'" (Plaintiff's Brief at 17.)

Plaintiff's basic argument is that the glues which Trommelen sold in its home market were neither identical nor similar to those sold in the U.S. As has already been indicated above, however, the Court finds that Trommelen did sell glues in the Netherlands which were "similar" to those exported to the U.S. within the meaning of 19 U.S.C. § 1677(16)(C). Nonetheless, where significant differences between "similar" merchandise have been found, the ITA has rejected the use of home market sales in determining foreign market value, in favor of third country sales or constructed value. *See e.g. Motorcycle Batteries from Taiwan,* 47 Fed.Reg. 9264 (1982); *Certain*

*Electric Motors from Japan,* 45 Fed.Reg. 73723 (1980).

In *Motorcycle Batteries from Taiwan, supra,* for example, the ITA declined to use home market sales as a basis for foreign market value, despite the fact that they accounted for approximately 10% of sales to third countries. The ITA's decision was based on the ground that all home market sales were of a single battery model (which accounted for less than 3% of the sales to the U.S.), whereas sales to the U.S. were of seventeen different models, with a wide variance in specifications. 47 Fed. Reg. 9264, 9267 (1982). This stands in contrast to the instant case in which a wide range of similar (albeit not identical) glues were sold both in the home market and in the U.S.

In *Certain Electric Motors from Japan, supra,* the ITA determined that the use of home market sales would have required innumerable cost adjustments[2] and noted that, unlike the case of U.S. sales, the motors were often sold as parts of entire power plants and were usually specially designed to customer specifications.

Given the fact that Trommelen's home market sales satisfy the five percent standard of 19 C.F.R. § 3534(a) and the fact that the merchandise in question is similar and does not present any unusual circumstances (e.g. number of adjustments which would have to be made) the Court finds that it was reasonable and in accordance with the law for defendant ITA to rely on home market sales as a basis for determining foreign market value, in accordance with 19 U.S.C. § 1677b(a)(1)(A).

Plaintiffs argue that defendant should have used sales by Trommelen to a 3rd country, (UK)[3]. But ITA has discretion to use home market sales if it deems them more appropriate and this Court will not substitute its own view for that of the agency.

2. Assuming that Trommelen's home market sales were an adequate basis for determining foreign market value, whether ITA's denial of an adjustment to foreign market value for physical differences in the merchandise is supported by substantial evidence and is otherwise in accordance with law?

The Tariff Act, *as amended,* provides that certain adjustments shall be made in the calculation of foreign market value to allow for a more realistic comparison with United States prices. Specifically, if established to the "satisfaction" of the Department that they genuinely account for a variance between U.S. price and foreign market value, differences in quantities, level of trade, circumstances of sale, and similar merchandise shall be reflected in adjustments made to the foreign market value. 19 U.S.C. § 1677b(a)(4). The purpose of these adjustments is to fulfill the fundamental objective of the antidumping statute to obtain a fair comparison of prices at which identical or similar merchandise is sold in two different markets, at the same point in a chain of commerce, and under similar commercial conditions. *See e.g. Smith–Corona Group v. U.S.,* 713 F.2d 1568 (Fed.Cir.1983).

In 1980, Congress promulgated the antidumping duty regulations, 19 C.F.R. §§ 353.03 –.57 (1980). Section 353.16 of the Regulations, 19 C.F.R. § 353.16, deals with adjustments to be made due to the differences in physical characteristics:

> In comparing the U.S. price with the selling price in the home market, or for exportation to countries other than the United States in the case of similar merchandise, due allowance shall be made for differences in the physical characteristics of the merchandise in the markets being compared. In this regard, *the Secretary will be guided primarily by the differences in cost of production,* to the extent that it is established to his satisfaction that the amount of any price dif-

---

**2.** "Any comparison between the two would require cost adjustments for virtually every component except the motor frame and thus, for all practical purposes, would amount to a con-

structed value." 45 Fed.Reg. 73723, 73725 (1980).

**3.** Plaintiff's brief at 11.

ferential is wholly or partly due to such differences, *but, when appropriate, the effect of such differences upon the market value of the merchandise may also be considered.* In the case of merchandise which does not lend itself to comparison with other merchandise for the purpose of this Section, any method reasonably calculated to reflect the impact on cost or value of any differences in the merchandise under consideration may be used. (Emphasis added.)

In the instant case the ITA declined to make adjustments for physical differences on the ground that, because Trommelen did not provide it with any cost data, the ITA was "precluded from making any adjustments for physical differences." [4] (Defendant's Brief at 23.)

Defendant correctly contends that the regulation (§ 353.16) "dictates a clear preference for making adjustments for physical differences when differences in price are due to variations in the costs of production." (Defendant's Brief at 22.) However, defendant goes on to state that "adjustments for physical differences based upon differences in market value are explicitly discretionary and certainly not mandatory as plaintiff contends." (Defendant's Brief at 22, 23.) This position ignores the words of the regulation itself, which clearly states that "due allowance *shall be made* for differences in the physical characteristics of the merchandise ..." (emphasis added). 19 C.F.R. § 353.16.

Section 353.16 mandates by its terms that an adjustment be made in appropriate cases when foreign market value is determined according to the price at which "similar" merchandise is sold in the home market or for exportation to third countries. The regulation does state that differences in cost of production shall be the primary consideration in comparing the home market price to the U.S. price. But the regulation also describes other bases of consideration which may be used when appropriate, e.g., differences in market value, and "any

method reasonably calculated to reflect the impact on cost or value of any differences under consideration." 19 C.F.R. § 353.16. It is true that the latter two bases of consideration are discretionary inasmuch as, in the absence of differences in costs of production, no one method is mandated. However, this does not negate the mandatory effect of the statute and regulation as a whole. Although cost differences are the preferred basis, the regulation specifically contemplates and authorizes other methods as well. "[D]ue allowance shall be made for differences in the physical characteristics ..."—if there are no differences in cost of production or if this information is unavailable, than any reasonable method to determine such differences may be used. *Id.*

■ It is uncontroverted that the ITA asked Trommelen to submit cost of production data for glue on a grade-by-grade basis. Defendant states that Trommelen failed to provide these cost figures, submitting instead a list of prices for various glue strengths. Plaintiff insists that Trommelen cooperated fully in the ITA review investigation, but that Trommelen was simply unable to comply with ITA's request, as this data did not exist. In any case, defendant concluded that "when Trommelen failed to provide any cost data, the ITA was precluded from making any adjustments for physical differences." (Defendant's Brief at 23.) As indicated above, the fact that ITA had no data regarding cost of production did not in itself preclude ITA from making any adjustments for physical differences, as 19 C.F.R. § 353.16 provides other bases on which adjustments can be made.

■ Plaintiff alleges, and defendant admits, that Trommelen, while it did not submit data regarding cost of production, did submit information regarding the prices at which it sold various grades of glue in each of its markets. (R. 70–80.) Eschem, Inc.,

---

**4.** The ITA stated in its final determination that "[t]he Department requested cost of production data ... so that we could ... make adjustments for physical differences in merchandise. The

producer failed to provide adequate data, and as a result, we make comparison ... (without adjustments for differences) ..." (Defendant's Brief 24; R. 244.)

another importer of animal glue manufactured by Trommelen, furnished the ITA with a submission showing how price data could be used to make adjustments for the differences in the bloom-strength of the merchandise being compared. (R. 195–221.) However, given that Trommelen's price data indicated that the same bloomgram strength was sold at different prices in the home market [5] and that Trommelen had indicated that there is in fact an inverse relationship between the strengths of glues and their cost of production [6], defendant was justified in declining to make adjustments due to differences in physical characteristics. In fact, to make such adjustments, defendant would have had to rely solely on home market prices, and for the reasons set out above, those prices had been demonstrated not to be dispositive of the issue of value, and by extension, of physical difference.

Given the fact that Trommelen failed to provide the requested cost of production information and that the price information in question was not a reliable indicator of value, the ITA used other information, i.e., the "best information available." Indeed, 19 U.S.C. § 1677e(b) requires that the ITA do so:

> In making their determinations ... the administering authority ... shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, ... use the best information otherwise available.

This statute was discussed in *Atlantic Sugar*, 744 F.2d 1556 at 1560, where the Court noted "the use of the mandatory term 'shall', indicating that the ITC *must* use the best information otherwise available in the enumerated circumstances." (Emphasis in original.) On this basis ITA declined to make an adjustment to foreign market value for physical differences in the merchandise, and the Court finds that this denial is supported by substantial evidence and is otherwise in accordance with law.

3. Whether ITA's use of sales of 300 bloomgram glue as the basis for determining foreign market value for grade 250 glue is supported by substantial evidence and is otherwise in accordance with law?

Plaintiff's final argument is that the ITA's use of sales of 300 bloomgram glue as the basis for determining foreign market value for grade 250 glue was unlawful.

Plaintiff states that in the first Section 751(a) review the ITA determined margins of dumping by comparing the prices in the home market of glues which were most similar to the merchandise exported to the U.S. For example, in appraising sales of 250 bloomgram glue, ITA determined foreign market value by comparing it to home market sales of 230 bloomgram glue. In the next review, which is the subject of this case, ITA instead compared the imported glues with higher grade glues sold in the home market; e.g. 250 bloomgram glue was compared to 300 bloomgram glue. Plaintiff states that this was unlawful on the grounds that, *inter alia*, ITA ignored its obligation to make determinations on the basis of the "best information available".

This Court recently addressed a challenge to the ITA's use of the best information rule in *Seattle Marine Fishing Supply Co. v. U.S.*, —— CIT ——, 679 F.Supp. 1119 (1988), in which the Court indicated that in challenges to the use of best information available the issue is not which, of all the information ITA has to choose from, is the best information available, but rather, whether the information chosen by ITA is supported by substantial evidence on the record. In *Seattle Marine*, ITA refused to consider a questionnaire response from an exporter of the goods in question on the basis that the response was untimely. Plaintiff argued that, despite the delay, the response was submitted in sufficient time to allow its verification before the final determination was made. Therefore, plaintiff claimed that this response, and not the

---

**5.** Defendant's Brief at 17.

**6.** Plaintiff's Brief at 29. This assertion was reiterated and elaborated upon by plaintiff's counsel at oral argument.

information actually relied upon by the ITA, was the best information available. The Court rejected this argument, stating that "[t]he issue is not, as plaintiff would argue, whose information becomes the best information *otherwise* available, but whether or not evidence on the record supports the ITA's decision." *Id.* at 1128. (Emphasis in original.)

It is well established that in challenges to administrative reviews this Court must sustain the ITA's determination unless it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence has been held to be more than a "mere scintilla", but sufficient to reasonably support a conclusion. *Ceramica Regiomontana, S.A. v. U.S.*, — CIT —, 636 F.Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987).

■ In the instant case the Court finds that there is sufficient evidence in the record to support ITA's use of 300 bloomgram glue as a basis of comparison with U.S. sales of grade 250 for the purpose of determining foreign market value, despite ITA's admission that grade 230 glue appeared to be more similar.

As indicated earlier, 19 U.S.C. § 1677b and 19 U.S.C. § 1677(16), when read together, require that when using "similar" merchandise as a basis of comparison in determining foreign market value, the first of the three categories set out in § 1677(16) which is applicable is to be used. This generally results in the most similar merchandise being used, as the three categories set out in the statute are progressively less specific and precise. In this case the Court finds that the first applicable category is § 1677(16)(C),

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

Because the Court finds that both grade 300 glue as well as grade 230 glue may reasonably be compared with grade 250 glue, the Court must sustain ITA's use of grade 300 glue in accordance with the standard of review set out in § 1516a(b)(1)(B). As stated in *Matsushita Electric Industrial Co. v. U.S.*, 750 F.2d 927, 933 (Fed.Cir. 1984), "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."

### JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiff's motion for judgment based upon the administrative record is denied and this action is hereby dismissed.