The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Defendant,

and

NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation; Koyo Seiko Company, Ltd. and Koyo Corporation of U.S.A.; Caterpillar Inc., Defendant–Intervenors.

Slip Op. 94–87.
Court No. 91–09–00697.

United States Court of International Trade.

May 27, 1994.

Stewart and Stewart, Washington, DC, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Patrick J. McDonough, Julie Chasen Ross and Christopher J. Callahan, of counsel: Scott A. Scherff, Sr. Corporate Counsel, The Timken Co., for plaintiff The Timken Com.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: Linda S. Chang,

Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, for defendant.

Barnes, Richardson & Colburn, Chicago, IL, Robert E. Burke, Donald J. Unger and Jesse M. Gerson, for defendant-intervenors NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp.

Powell, Goldstein, Frazer & Murphy, Washington, DC, Peter O. Suchman, Susan P. Strommer, Susan M. Mathews, D. Christine Wood and Robert A. Calaff, for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Powell, Goldstein, Frazer & Murphy, Washington, DC, Richard M. Belanger, D. Christine Wood and Neil R. Ellis, for defendant-intervenor Caterpillar Inc.

## *OPINION*

TSOUCALAS, Judge:

Plaintiff, The Timken Company ("Timken"), commenced this action to challenge certain aspects of the Department of Commerce, International Trade Administration's ("Commerce") final results of the first administrative review of certain tapered roller bearings ("TRBs") from Japan. *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 56 Fed.Reg. 41,508 (Aug. 21, 1991).

### *Background*

In 1987, Commerce published an antidumping duty order on TRBs from Japan. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 37,352 (Oct. 6, 1987). In 1989, Commerce initiated the first administrative review of the TRBs covered by the 1987 order covering the period March 27, 1987 through September 30, 1988. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 54 Fed.Reg. 9,868 (March 8, 1989). On April 3, 1991, Commerce published the preliminary results of its 1987–88 administrative review of the 1987 antidumping duty order. *Tapered Roller Bearings and Parts Thereof,*

*Finished and Unfinished From Japan; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 13,618 (April 3, 1991). On August 21, 1991, Commerce published its Final Results in this proceeding. *Final Results,* 56 Fed.Reg. 41,-508.

Timken has challenged the following actions by Commerce alleging that these actions were unsupported by substantial evidence on the administrative record and not in accordance with law: (1) failure to use best information available ("BIA") for cost of production information allegedly not provided; (2) treatment of discounts and rebates to United States exporter's sales price ("ESP") sales as indirect selling expenses; (3) exclusion of certain home market sales as not in the ordinary course of trade; (4) acceptance of cost of production data; (5) failure to conduct verification; (6) adjustment of foreign market value for home market pre-sale freight expenses; (7) failure to collect antidumping duty deposits on merchandise admitted into a foreign trade zone ("FTZ"); (8) allocation of losses to the "value added" for further processing of merchandise after importation; and (9) several computer programming errors. *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record* ("*Plaintiff's Brief*") at 16–87.

### *Discussion*

This Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

This Court must uphold final results of an administrative review by Commerce unless the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for

sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Best Information Available*

■ Timken asserts that as defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation ("NTN") have failed to provide Commerce with all requested cost of production information, Commerce is required to make its determination using the best information otherwise available pursuant to 19 U.S.C. § 1677e(c) (1991). *Plaintiff's brief* at 16–20.

Relying on *Timken Co. v. United States,* 10 CIT 86, 630 F.Supp. 1327 (1986), Timken argues that Commerce has abdicated its role by allowing NTN to select the information used to calculate NTN's dumping margin. *Plaintiff's Brief* at 19. More specifically, Timken argues that Commerce has abdicated its duty under 19 U.S.C. § 1677b(a)(1)(A) (1991) and 19 U.S.C. § 1677(16) to select sales of home market merchandise most similar to models sold in the U.S. *Plaintiff's Reply Brief* at 2–4. Plaintiff urges this Court to remand to Commerce for a recalculation of NTN's dumping margin based on BIA or, in the alternative, to remand with instructions that Commerce collect the missing data. *Id.* at 9.

Defendant argues that because the omitted data is a comparatively small amount of the home market merchandise considered and there is no indication that those sales were the most comparable merchandise to the merchandise exported to the U.S., no remand to Commerce for recalculation of NTN's dumping margin is warranted. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record* ("*Defendant's Brief*") at 7.

NTN asserts that Commerce was satisfied with the information provided by NTN and that Commerce communicated that NTN need not file any response to its September 26, 1990 supplemental request for additional information as to cost of production. *Response Brief of Defendant–Intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, and NTN Corporation to Plaintiff's Motion for Judgment on the Agency Record* ("*NTN's Brief*") at 9–17. NTN has memorialized this alleged understanding in its rebuttal brief before Commerce of May 21, 1991. *Id.* at 15.

Plaintiff responds to the defendant's argument that the omitted data is a comparatively small amount of the home market merchandise considered by arguing that the ratio of missing data to home market sales is irrelevant. *Plaintiff's Reply Brief* at 4. Plaintiff argues that it is U.S. sales data and the similarity of the home market merchandise to the U.S. sales which determines the dumping margin. *Id.* at 4–5. Thus, plaintiff argues, cost data omitted for a single identical home market sale could have tremendous impact if it was a large-volume item in the U.S. *Id.*

Plaintiff's reliance on *Timken* is misplaced. The errors committed by Commerce in *Timken* were numerous and egregious in degree. *Timken,* 10 CIT at 95–100, 630 F.Supp. at 1336–40. In contrast, Commerce here has apparently deemed constructed value information submitted by NTN adequate for purposes of any missing cost of production information. *Final Results,* 56 Fed.Reg. at 41,511.

However, plaintiff is quite correct that Commerce is required to use BIA under certain circumstances. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed. Cir.1984), *cited in, U.H.F.C. Co. v. United States,* 13 CIT 119, 129, 706 F.Supp. 914, 922 (1989), *aff'd in part, rev'd in part,* 916 F.2d 689 (Fed.Cir.1990), *vacated and remanded,* 14 CIT 753 (1990); *see also, Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1190 (Fed.Cir.1993). Section 1677e(c) of Title 19, U.S.C., states that Commerce "shall, whenever a party . . . refuses or is unable to produce information requested in a timely manner . . . use the best information otherwise available."

It is well-established, however, that Commerce has broad discretion with regard to when the use of BIA is appropriate. *See, e.g., Olympic Adhesives, Inc. v. United*

*States,* 899 F.2d 1565, 1571–72 (Fed.Cir. 1990).

Despite extensive review of the administrative record by this Court, it is simply not clear whether Commerce received all the data it requested of NTN in its letter dated September 26, 1990 and, if it did not, whether Commerce deemed the missing data unnecessary. Therefore, this Court remands for Commerce to account for the allegedly missing data. If indeed NTN did not completely respond to the request for data without instruction from Commerce to do so, Commerce is required to recalculate NTN's dumping margin using the best information otherwise available. If, however, Commerce did receive all the data or exercise its broad discretion in this matter and deemed the missing information unnecessary, then the dumping margin need not be recalculated.

### 2. *U.S. Selling Expenses*

■ Defendant-intervenors Koyo Seiko Company, Ltd. and Koyo Corporation of U.S.A. ("Koyo") granted discounts and rebates in the U.S. which were not tied directly to sales of covered merchandise. Commerce classified these discounts and rebates as indirect selling expenses. *Final Results,* 56 Fed.Reg. at 41,514.

Timken contests this treatment of Koyo's U.S. discounts and rebates on the grounds that there is a presumption that U.S. selling expenses are direct and the burden of proving otherwise is on the respondent. *Plaintiff's Brief* at 21–22. Timken explains the incentive that exists for a respondent to fail to provide information which ties U.S. selling expenses directly to sales of covered merchandise: a U.S. indirect selling expense can be "offset" by home market indirect selling expenses pursuant to 19 C.F.R. § 353.-56(b)(2). *Id.* at 21. Such an offset, which is not permitted with U.S. *direct* selling expenses, increases allowable deductions from foreign market value and reduces dumping margins. *Id.*

Defendant maintains that the discounts and rebates were properly classified as indirect selling expenses because Koyo recorded them on a customer-specific basis and they could not be correlated with specific sales.

*Defendant's Brief* at 8–11. Defendant argues that because Commerce classifies home market discounts and rebates as indirect selling expenses when they cannot be correlated with specific sales, Commerce should do the same for U.S. discounts and rebates. *Id.* at 9.

Koyo argues that treatment as indirect selling expenses is appropriate because Koyo granted and reported the expenses on a customer-specific basis, Commerce verified the allocation of the expenses and Commerce treated them identically in both the U.S. and the home market. *Memorandum of Defendant–Intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. in Opposition to The Timken Company's Motion for Judgment on the Agency Record ("Koyo's Brief")* at 8–12. Koyo contends that inconsistent treatment of U.S. and home market expenses would distort the comparison between U.S. and home market price and unfairly widen any dumping margins. *Id.* at 10–11.

This Court finds that defendant's and Koyo's arguments are without merit. It is established that U.S. selling expenses are presumed to be direct and the burden of proving otherwise is on the respondent. *Timken Co. v. United States,* 11 CIT 786, 804, 673 F.Supp. 495, 512–13 (1987); *see also Torrington Co. v. United States,* 17 CIT ——, ——, 832 F.Supp. 365, 376, 378 (1993); *see also Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,951, 4,955 (Feb. 11, 1992); *see also Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Certain Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 65,228, 65,229 (Dec. 16, 1991).

A contrary practice would destroy any incentive a respondent has to provide Commerce with actual U.S. selling expense information. *Torrington Co.,* 17 CIT at ——, 832 F.Supp. at 376. An indirect U.S. selling expense can be "offset" by home market indirect selling expenses. 19 C.F.R. § 353.-56(b)(2) (1991). Such an offset, which is not permitted with U.S. selling expenses classi-

fied as direct, increases allowable deductions from foreign market value and reduces dumping margins. It would therefore be to the respondent's advantage to fail to provide Commerce with information directly relating U.S. selling expenses to sales of covered merchandise. *Timken Co.,* 11 CIT at 804, 673 F.Supp. at 513.

As Koyo has failed to overcome the presumption that the U.S. discounts and rebates are direct selling expenses, this issue is remanded to Commerce for recalculation of the dumping margin after reclassification of Koyo's U.S. rebates and discounts as direct selling expenses.

### 3. *Sales Outside the Ordinary Course of Trade*

■ Commerce has excluded from its calculation of foreign market value NTN home market sales identified as sales not made in the "ordinary course of trade." *Final Results,* 56 Fed.Reg. at 41,517. Commerce described these sales as trial sales for evaluation by customers, sales of sample merchandise and sales of very small quantities on a spot basis in unusual circumstances. *Id.* Commerce determined that exclusion of these sales would not meaningfully affect the results of its review due to the significant number of home market sales transactions. *Id.*

Timken argues this treatment of the sales is unsupported by substantial evidence. *Plaintiff's Brief* at 23–27. Timken contends that Commerce's determination is supported only by NTN's assertion that the sales at issue are not in the ordinary course of trade and that sales merely alleged to be outside the ordinary course of trade but not so demonstrated should be included in calculation of foreign market value. *Id.* at 23–25.

Timken further argues it is not the number of home market sales excluded that is relevant, but rather, the similarity of those sales to the U.S. sales at issue. *Id.* at 26–27. Thus, Timken argues, even a single home market sale which is "most similar" to a large volume of U.S. sales would have a significant effect on these results. *Id.*

Defendant contends the exclusion of these sales was proper because Commerce acted within its broad discretion to determine whether a sale is made in the ordinary course of trade. *Defendant's Brief* at 11–14. Further, defendant argues Commerce acted consistently with its practice of excluding sales allegedly not in the ordinary course of trade when a respondent demonstrates the sales were in small quantities at prices that were not representative of the vast majority of sales reported. *Id.* at 13.

NTN echoes the arguments made by defendant, adding that it is for Commerce and not Timken to make these determinations. *NTN's Brief* at 17–19.

Commerce calculates foreign market value by following the general method prescribed by 19 U.S.C. § 1677b(a)(1)(A). It provides in pertinent part:

> The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person ...
>
> (A) at which *such or similar merchandise* is sold, or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the *ordinary course of trade* for home consumption ...

19 U.S.C. § 1677b(a)(1)(A) (1988) (emphasis added); *see also* 19 C.F.R. § 353.46(b) (1991). The statute defines "ordinary course of trade" as "the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1988).

In addition, "such or similar merchandise" contained in 19 U.S.C. § 1677b(a)(1)(A) requires Commerce to select merchandise in the first of the following categories:

> (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the

same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16) (1988).

Commerce's decision of whether an importer's sales are in the ordinary course of trade is entitled to tremendous deference from this Court and the plaintiffs have the burden of demonstrating the sales Commerce excluded from its foreign market value calculation were *not* outside the ordinary course of trade. *Mantex, Inc. v. United States,* 17 CIT ——, ——, 841 F.Supp. 1290, 1306 (1993); *see also Nachi–Fujikoshi Corp. v. United States,* 16 CIT ——, ——, 798 F.Supp. 716, 718–19 (1992).

Timken has not met this burden and the administrative record in this case is lacking in substantial evidence to prove otherwise.

Timken's argument that Commerce must consider even a single home market sale if it is "most similar" to the U.S. sales at issue is also without merit. 19 U.S.C. § 1677(16), which sets forth the categories of "such or similar merchandise" against which Commerce may compare the merchandise under review, grants Commerce broad latitude. This provision only requires Commerce to select merchandise "in respect of which a determination ... *can be satisfactorily made.*" 19 U.S.C. § 1677(16) (emphasis added). Because Commerce is charged with making the determinations to which this pro-

vision refers, the assessment of whether a determination is satisfactory lies with Commerce. *Mantex, Inc.,* 17 CIT at ——, 841 F.Supp. at 1306.

Since the record in this case indicates Commerce considered similar merchandise, this Court finds Commerce's decision to exclude the sales at issue from their calculation of foreign market value to be reasonable and in accordance with law.

### 4. *Cost of Production Information*

■ After verification, Commerce accepted the information Koyo submitted in response to a cost of production questionnaire for home market TRB models. *Final Results,* 56 Fed.Reg. at 41,514–16. Timken contests the cost of production information on the grounds that it does not accurately reflect the production costs of the subject merchandise. *Plaintiff's Brief* at 28–42.

Specifically, Timken argues the information Koyo provided fails to reflect the actual production costs of subject merchandise because Koyo's "basic cost" system determines variances on a corporate-wide basis and costs at the production line level and then allocates them to subject merchandise, and because Koyo determined labor costs on a corporate-wide basis and then allocated them accordingly. *Id.* In addition, Timken argues that the reconciliation of Koyo's financial statements with the cost information and variances should not be determinative of whether the data reflects actual production costs of subject merchandise. *Id.* at 40–41.

The defendant counters by arguing Commerce is not required to accept only model-specific costs. *Defendant's Brief* at 14–19. Defendant asserts Koyo's accounting system and allocation of expenses and variances reasonably reflect the cost of producing the subject merchandise. *Id.*

Koyo asserts its cost accounting system conforms to generally accepted accounting principles of Japan, provides actual costs and, thus, was appropriately accepted by Commerce. *Koyo's Brief* at 12–19. Koyo argues its cost responses are particularly accurate, given the homogeneous nature of

the products being manufactured (ball bearings) and the small degree of variance between its standard and actual costs. *Id.* at 14. Koyo asserts its corporate-wide labor rate is not distortive as the wage costs do not vary according to the type of bearing produced. *Id.* at 15–17. Finally, Koyo asserts that it accumulates and reported all its variances and costs by expense type at the plant level and not on a corporate-wide basis. *Id.* at 17–19.

In its final results, Commerce rejected Timken's position stating:

> We verified Koyo's cost system and found it acceptable. Koyo based its costs on the standard cost system used in its normal course of business. The standard costs were adjusted by the variances which occurred between these standards and its actual costs. The submission was not based on prior period costs. The variances were calculated by comparing the basic cost to the actual cost of production. The Department reviewed Koyo's model-specific basic costs and variances by reconciling them to the financial statements. Koyo did not use a corporate-wide variance calculation. Its standard costs are adjusted for variances incurred at each factory. Koyo calculated the plant-wide variance by comparing the total plant-wide cost of production with the plant-wide basic costs, which we determined did not distort model-specific costs of production. Furthermore, Koyo demonstrated at verification that its cost system appropriately accounts for the different types of bearings.

*Final Results,* 56 Fed.Reg. at 41,514.

Regarding Koyo's corporate-wide labor costs, Commerce stated:

> The Department accepted the corporate-wide labor rate because the other products produced by Koyo involve manufacturing process similar to the processes for the subject merchandise. The Department believes that no distortion occurred as a result of using this rate or the associated corporate-wide variance.

*Final Results,* 56 Fed.Reg. at 41,515–16.

According to 19 U.S.C. § 1677b(b) (1988):

> Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales made at less than cost of production—
>
> > (1) have been made over an extended period of time and in substantial quantities, and
> >
> > (2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade,
>
> such sales shall be disregarded in the determination of foreign market value.

*See also* 19 C.F.R. § 353.51(a).

Congress has granted Commerce considerable latitude in determining cost of production. The House Report notes:

> ... in determining whether merchandise has been sold at less than cost, the Secretary will employ accounting principles generally accepted in the home market of the country of exportation if *he is satisfied* that such principles *reasonably reflect* the variable and fixed costs of producing the merchandise.

H.R.Rep. No. 93–571, 93rd Cong., 1st Sess. 71 (1973) (emphasis added).

In addition, 19 U.S.C. § 1677b(b) neither imposes a requirement that only actual costs be used nor prohibits the use of allocations, adjustments or apportionments in determining cost of production. Considering this and Commerce's thorough explanation of their findings which are supported by our reading of the administrative record, this Court agrees with Commerce on this issue and rules that it acted reasonably and in accordance with law. Therefore, Commerce's determination as to this issue is hereby affirmed.

### 5. *Failure to Conduct Verification*

■ Commerce declined Timken's request to verify NTN's questionnaire response for this review. *Final Results,* 56 Fed.Reg. at 41,511.

Timken contends that, because it submitted a timely request for verification and no verification has occurred in either of two prior annual reviews, 19 U.S.C. § 1677e(b)(3) requires Commerce to verify NTN's response. *Plaintiff's Brief* at 43–47. To support its position, Timken cites *Industrial Quimica Del Nalon, S.A. v. United States,* 13 CIT 1055, 729 F.Supp. 103 (1989), where this Court found verification mandatory when timely requested and no verifications had occurred in either of the two preceding review periods. *Plaintiff's Brief* at 46.

Defendant argues that Timken misinterprets the statute and that the Court erred in *Industrial Quimica* because the Court's reasoning was based upon a decision interpreting a prior version of the relevant statute. *Defendant's Brief* at 19–23.

NTN also responds by arguing Timken has misread 19 U.S.C. § 1677e(b)(3) and by distinguishing *Industrial Quimica. NTN's Brief* at 20–24.

In relevant part, 19 U.S.C. § 1677e(b) states:

> The administering authority *shall verify* all information relied upon in making—
>
> .    .    .    .    .
>
> (3) a review and determination under section 1675(a) of this title, if—
>
> (A) verification is timely requested by an interested party ... and
>
> (B) no verification was made under this paragraph *during the 2 immediately preceding reviews and determinations* under that section of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

19 U.S.C. § 1677e(b) (1988) (emphasis added). This provision is mirrored by 19 C.F.R. § 353.36(a) (1991).

In other words, verification is mandatory when two conditions are met: (1) a request for verification is made in a timely manner by an interested party, and (2) there has been no verification in the prior two reviews. It is the second condition which is at issue in this case.

Clearly, if Commerce were conducting its third consecutive review without yet making a verification and an interested party had made a timely request for verification, as had occurred in *Industrial Quimica,* Commerce would be required to do so. *Industrial Quimica,* 13 CIT at 1057–61, 729 F.Supp. at 105–108. In the instant case, however, the challenged review is the first administrative review. Therefore, *Industrial Quimica* is distinguished from this case and Timken's reliance on that case is misplaced.

Timken suggests that this second condition, that there be no verification in the prior two reviews, is met as there has been no verification in any preceding review. *Plaintiff's Brief* at 43. It would be more accurate to say we do not yet know whether the second condition has been met or not because there have not yet been "2 immediately preceding reviews and determinations". Timken undertakes to create a mandatory verification at the first review upon timely request, in effect, re-writing the statute.

Further, this Court has stated that in a first review, the ITA is required to conduct verification only if timely requested by an interested party and only if good cause for verification is shown. *Torrington Co. v. United States,* 17 CIT ——, ——, 832 F.Supp. 393, 397 n. 1, (1993). Therefore, this Court affirms Commerce's action as reasonable and in accordance with law.

### 6. *Pre–Sale Inland Freight Expenses in the Home Market*

■ Commerce treated NTN's home market pre-sale inland freight expenses as direct selling expenses and, as such, deducted them from foreign market value ("FMV"). *Final Results,* 56 Fed.Reg. at 41,512.

Timken contests this treatment, alleging it is contrary to law and not supported by substantial evidence. *Plaintiff's Brief* at 48–54; *Plaintiff's Reply Brief* at 26–28. For support, Timken turns to the relevant statute, 19 U.S.C. § 1677b(a)(4), and its legisla-

tive history which suggest that adjustments to foreign market value should be limited to selling expenses directly related to the sales under consideration. *Plaintiff's Brief* at 48–50. Timken argues that, as pre-sale freight expenses may not relate to a home market transaction, they should not be deducted as direct selling expenses. *Id.* at 53.

Defendant argues Commerce's practice of adjusting FMV for home market pre-sale freight charges is reasonable and implements an important principle of the antidumping law, which is to provide for a fair price comparison. *Defendant's Brief* at 23–28. Defendant asserts that a contrary practice entails a comparison of an ex-factory price in the United States with an ex-warehouse price in the home market, as Commerce does adjust *United States* price for pre-sale freight expenses. *Id.* at 26. Therefore, defendant argues, denying the adjustment for *home market* pre-sale freight charges would result in an unfair comparison of prices from different points in the chain of commerce. *Id.*

NTN echoes the arguments made by the defendant. *NTN's Brief* at 24–28.

This Court is bound to follow the decision of the Court of Appeals for the Federal Circuit which has held that pre-sale home market transportation costs are not to be deducted from FMV. *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 402 (Fed.Cir.1994). Therefore, this Court remands this issue for Commerce to deny the adjustment to FMV for NTN's pre-sale transportation expenses.

### 7. Collection of Antidumping Duties in Free Trade Zone

■ Commerce neither obtained information regarding TRBs admitted into a foreign trade zone nor required the collection of antidumping duty deposits on the merchandise. *Final Results,* 56 Fed.Reg. at 41,517. Timken contests this treatment. *Plaintiff's Brief* at 55–73.

Timken alleges Commerce "short-sighted[ly]" and improperly determined that "entry" of merchandise pursuant to the antidumping law takes place only upon release of the merchandise into the U.S. customs territory and not upon its arrival into the geographic confines of the U.S. *Id.* at 55–61. Timken argues that as the focus of the antidumping law is on importation of subject merchandise and that importation occurs when merchandise enters the geographic U.S., the deposit of antidumping duties should occur upon entry of subject merchandise into FTZs. *Id.* In addition, Timken points out that foreign merchandise within a FTZ is considered imported for purposes of all U.S. laws except the customs laws of the United States (19 U.S.C. § 81c). *Id.* at 59–61. Timken then argues the antidumping duty statute is not part of the customs law of the United States. *Id.* at 61–64. Therefore, Commerce should be required to collect antidumping duties upon the importation into a FTZ of merchandise subject to an antidumping duty order. *Id.*

Timken also argues that Commerce erred in not requiring the importers of subject merchandise to elect privileged status for their imports into FTZs pursuant to regulations which require importers of merchandise subject to an antidumping duty order into a FTZ to elect privileged status for the merchandise. *Plaintiff's Brief* at 64–65, 69–72; *see* 15 C.F.R. § 400.33(b) (1992) (effective from April 6, 1992).

Defendant responds by arguing that the reference to "entry" of merchandise in the antidumping statute unambiguously refers to the release of merchandise into the customs territory of the United States and does not refer to merchandise admitted into a FTZ. *Defendant's brief* at 28–33. Defendant further argues that the reference to "customs laws" in the FTZ Act (19 U.S.C. § 81c) does include antidumping laws, thus exempting merchandise in a FTZ subject to an antidumping order from assessment of antidumping duties. *Id.* at 33–35. Defendant points out that the regulation to which Timken refers which requires importers of merchandise subject to an antidumping duty order to elect privileged status for the merchandise was not effective until after the review period and publication of the final results in this case. *Id.* at 35–37. Therefore, 15 C.F.R. § 400.33(b) does not grant

Commerce the authority to order the merchandise in question to be admitted into FTZs under privileged status. *Id.*

Defendant-intervenor Caterpillar Inc. ("Caterpillar") and NTN agree with defendant's arguments. *Memorandum of Defendant–Intervenor Caterpillar Inc. in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Caterpillar's Brief")* at 4–12; *NTN's Brief* at 28–30.

This Court has previously ruled on this issue and adheres to its decision in *Torrington Co. v. United States,* 17 CIT ——, ——, 818 F.Supp. 1563, 1572 (1993). *See also Torrington Co. v. United States,* 17 CIT ——, ——, 826 F.Supp. 492, 494 (1993). This Court finds that the Foreign Trade Zone statute on its face exempts foreign merchandise within a FTZ from the imposition of antidumping duties until that merchandise is brought into the U.S. customs territory, unless some other provision of the Foreign Trade Zone statute or the regulations promulgated thereunder require otherwise. *Torrington,* 17 CIT at ——, 826 F.Supp. at 494; *see also Torrington,* 17 CIT at ——, 818 F.Supp. at 1572. At the time of the imports in question there was no statute or regulation that required that antidumping duties be imposed on merchandise imported into a FTZ until the merchandise entered U.S. customs territory. Therefore, Commerce's determination on this issue is hereby affirmed.

### 8. *Allocation of Losses to Exporter's Sales Price*

■ In calculating United States price for Koyo bearings, Commerce allocated losses as well as profits to the "value added" for further processing after importation. Administrative Record Public Document Number 211 at 1.

Timken argues this practice is contrary to law because 19 U.S.C. § 1677a(e)(3), which allows for reductions in exporter's sales price for further processing of merchandise after importation in the amount of "value added," does not specifically provide for allocating losses to the "value added" calculation. *Plaintiff's Brief* at 74–79. Timken argues that by adding back losses incurred by Koyo or its U.S. subsidiary, Commerce defeats the

purpose of the exporter's sales price provision, which is to achieve a proxy for the price that Koyo would have charged to an unrelated party. *Id.* at 76–79.

Defendant points out that this Court has sustained Commerce's practice of allocating losses to the "value added" in the United States as a reasonable interpretation of the statute. *Defendant's Brief* at 38–39; *Timken Co. v. United States,* 14 CIT 753, 1990 WL 180495 (1990). Defendant argues that to impose duties upon the value of the imported merchandise only, it is not sufficient to merely add the cost of the materials and labor for further processing in the United States without taking into account the loss or profit incurred upon the sale of the product. *Defendant's Brief* at 39.

Koyo echoes the arguments of the defendant and asserts Timken provides no new reasons why the Court should change its position on this issue. *Koyo's Brief* at 19–20.

The Court has previously ruled on this issue and adheres to its decision in *Timken Co.,* 14 CIT 753. This Court finds that Commerce's practice of allocating losses to the "value added" is consistent with the statutory intent that dumping duties be imposed on the value of the imported merchandise only. *Timken Co.,* 14 CIT at 755–56; *see also* 19 U.S.C. § 1677a(e)(3). Therefore, Commerce's determination is hereby affirmed.

### 9. *Clerical Errors*

Timken alleges that Commerce made six clerical errors which require correction. *Plaintiff's Brief* at 80–87.

First, as to the NTN final results, Timken alleges improper use of a delete command which resulted in the exclusion of certain home market models which are most similar to the U.S. models to which they are compared. *Id.* at 80–81.

Commerce agrees that the computer program used a delete command that resulted in the exclusion of certain home market models for comparison with U.S. models contrary to Commerce's intent. *Defendant's Brief* at 40. Commerce believes the error should be corrected by using a new command which, in

effect directs that "if VCOM is less than 20%, do the match." *Id.* Commerce states the case should be remanded for correction of the delete command, without specifying the command that Commerce should substitute for the erroneous command. *Id.*

Timken agrees with Commerce as to the correction that should be made. *Plaintiff's Reply Brief* at 40. NTN defers to the expertise of Commerce as to what correction need be made. *NTN's Brief* at 30. Therefore, this Court remands this issue for correction as suggested by Commerce.

Second, also as to the NTN final results, Timken alleges incorrect use of the DIF-MER test which excluded from consideration prior to actual model matching home market models which failed the test for *any* of the covered years, even if the models may have been acceptable for other years. *Plaintiff's Brief* at 81–82.

Commerce asserts that no error occurred. *Defendant's Brief* at 40–42. NTN agrees with Commerce. *NTN's Brief* at 30. Timken, also, agreed with Commerce that no error occurred. *Plaintiff's Reply Brief* at 40. Therefore, this Court affirms Commerce's action as to this alleged clerical error.

Third, as to the Koyo final results, Timken alleges incorrect programming language resulting in a distortion of home market prices of roller bearing sets split into cups and cones for comparison with U.S. prices. *Plaintiff's Brief* at 82–85. Koyo agrees with Timken. *Koyo's Brief* at 20.

Commerce agrees that the computer program inadvertently duplicated the set observation each time it created a split cup and split cone, but that the error had no impact upon the calculations because in each case the weighted-average foreign market value would be the same. *Defendant's Brief* at 42–43. Timken later agreed that the error was without consequence and correction was unnecessary. *Plaintiff's Reply Brief* at 40. Therefore, this Court affirms Commerce's action as to this alleged clerical error.

Fourth, also as to the Koyo final results, Timken alleges an error in the program for the exclusion of sales made below cost. Timken alleges Commerce failed to tie the

results of model-by-model cost-test analysis with the sales from which the results derived with the result that the program identified certain "real sales" as lacking cost data and/or constructed value data. As a result, best information available ("BIA") was erroneously used. Timken asserts Commerce should include a data step in the program to merge the cost summary data with the original sales data so that all sales records have cost summary information. *Plaintiff's Brief* at 85–87; *Supplemental Brief of The Timken Company* at 2–3.

Koyo agrees with Timken's position and urges this Court to remand this issue for Commerce to correct this error. *Koyo's Brief* at 20.

Defendant agrees it has committed a programming error, but argues that it is harmless. *Defendant's Brief* at 43–45. Defendant acknowledges that the error did affect a small number of units. *Id.* at 44–45. Since this case is being remanded for the correction of a programming error as to NTN, the clerical error as to Koyo should also be corrected.

Fifth, as to the Koyo final results, Timken alleges the method used to calculate an average margin included unmatched sales in the denominator to calculate a percentage margin of dumping. Timken alleges Commerce effectively assigned a zero margin to unmatched sales and diluted the average dumping margin applied to all other sales. Commerce intended, however, to calculate a margin of dumping for all U.S. sales which were matched either with constructed value or foreign market value and then to apply that margin (as BIA) to any unmatched sales. Timken proposes program instructions to correct this alleged error. *Supplemental Brief of The Timken Company* at 3–6.

This Court remands this issue to Commerce to determine if a clerical error occurred and, if so, to carry out any necessary correction.

Lastly, also as to the Koyo final results, Timken alleges that no transaction-specific margin of dumping was computed for transactions matched with constructed value because no values are calculated for home mar-

ket commissions or home market indirect expenses in the long program step where transaction-specific margins are calculated. The absence of values for home market commissions and indirect expenses results in no foreign market value for these transactions. Timken proposes program instructions to correct this alleged error. *Supplemental Brief of the Timken Company* at 6–8.

This Court remands this issue to Commerce to determine if a clerical error occurred and, if so, to carry out any necessary correction.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to account for the allegedly missing cost of production data and to use BIA if Commerce did not receive the requested data and did not exercise its broad discretion to deem the data

unnecessary; to reclassify discounts and rebates to ESP as direct selling expenses; to deny the adjustment to foreign market value for home market pre-sale freight expenses; and to correct certain computer programming errors. Commerce's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.